ANDREW VACCO *v.* MICROSOFT CORPORATION
(SC 16566)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued November 1, 2001—officially released April 16, 2002

*Ben A. Solnit*, with whom, on the brief, were *William H. Champlin III* and *Richard W. Bowerman*, for the appellant (plaintiff).

*David B. Tulchin*, pro hac vice, with whom were *Joseph E. Neuhaus*, pro hac vice, and, on the brief, *James Sicilian*, *Mario R. Borelli* and *Mark M. Rembish*, for the appellee (defendant).

*Richard Blumenthal,* attorney general, and *Steven M. Rutstein* and *Roger F. Reynolds,* assistant attorneys general, filed a brief for the office of the attorney general as amicus curiae.

*Robert M. Langer* and *Erika L. Amarante* filed a brief for the Connecticut Business and Industry Association, Inc., et al. as amici curiae.

*Opinion*

ZARELLA, J. This appeal raises two significant issues.[1] First, as a matter of first impression, we must determine whether the plaintiff, Andrew Vacco,[2] as an end user licensee[3] of a software product manufactured by the defendant, Mircosoft Corporation, may maintain a claim against the defendant pursuant to the Connecti-

[1] The plaintiff presented the following three issues on appeal: "(1) Whether the trial court erred in holding that *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720 [97 S. Ct. 2061, 52 L. Ed. 2d 707] (1977), bars an antitrust claim by a direct licensee of the product in question . . .

"(2) Whether the trial court erred in holding that *Illinois Brick Co.* v. *Illinois,* [supra, 431 U.S. 720], overrides the express right granted to consumers by [General Statutes] § 35-35 to bring an antitrust action . . . and

"(3) Whether the trial court erred in holding that the striking of [the] plaintiff's antitrust claim also required the striking of [the] plaintiff's claims brought pursuant to the Connecticut Unfair Trade Practices Act [CUTPA], [General Statutes] § 42-110a et seq."

At oral argument, the plaintiff further narrowed the statement of the issues as follows: "First, whether [the plaintiff] can bring a claim under the Connecticut Antitrust Act [General Statutes § 35-24 et seq.] and, second, even if that claim is barred, whether [the plaintiff] can still bring his claims under [CUTPA]."

[2] Although Vacco purportedly brought this action as a class action on behalf of himself and other similarly situated end user licensees of the defendant's software product who reside in Connecticut, there is no indication that the trial court certified his action as a class action. We, therefore, refer to Vacco as the plaintiff.

[3] An "end user" refers to the "ultimate consumer of a finished product." Merriam-Webster's Collegiate Dictionary (10th Ed. 1997). In the context of this case, the term refers to a customer who has purchased from a vendor or retailer a computer system that includes preloaded software. See M. Lemley et al., Software and Internet Law (2000) p. 1092.

cut Antitrust Act (Antitrust Act), General Statutes § 35-24 et seq. Second, we must determine whether the plaintiff may maintain a claim, predicated on the same factual allegations underlying the antitrust claim, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We conclude that the plaintiff, as an indirect purchaser of the defendant's software product, may not recover under the Antitrust Act. We also conclude that the plaintiff is barred from bringing a claim under CUTPA because his alleged injuries are too remote with respect to the defendant's alleged conduct. We, therefore, affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. In September, 1999, the plaintiff purchased from a retail store[4] in Wallingford an Intel-based personal computer[5] onto which Windows 98[6] had been preinstalled. As a precondition to using Windows 98, the plaintiff was required to enter into an end user licensee agreement with the defendant specifying that Windows 98 was licensed, as opposed to sold, to the end user.[7] Thereafter, the plaintiff brought this action

---

[4] The retail store is one in a chain of stores known as "Staples." Staples is neither a party to this action nor is it affiliated with the defendant.

[5] An "Intel-based personal computer" is a computer designed to function with a microprocessor manufactured by the Intel Corporation or with a compatible microprocessor manufactured by another firm. According to the complaint, Intel-based personal computers are the most widely used and sold computers in the United States and Connecticut. Intel Corporation is not a party to the present action.

[6] "Windows 98" is a computer software program that functions as a computer operating system. The plaintiff defines "computer operating system" in his complaint as "a software program that controls the allocation and use of computer resources, such as central processing unit time, main memory space, disk space, and input and output channels. . . . The operating system also supports the functions of other software programs, called 'applications,' that perform particular tasks for the [personal computer] user, such as word processing, [spreadsheet] design and use, and database management."

[7] It is important to note that the use of end user license agreements is standard practice in the software distribution market. See, e.g., R. Schechter,

against the defendant,[8] alleging violations of the Antitrust Act and CUTPA.[9] The gravamen of the plaintiff's complaint is that the defendant wielded monopoly power in the computer operating systems market and, in wielding that power, "knowingly licensed its Windows 98 operating system for Intel-based [personal computers] . . . without regard to competition, at a monopoly price in excess of what [the defendant] would have been able to charge in a competitive market."

The defendant moved to strike the plaintiff's complaint on the ground that the plaintiff had failed to state a claim upon which relief could be granted. Specifically, the defendant contended that the plaintiff was an indirect purchaser of Windows 98 who was ineligible to

"The Unfairness of Click-On Software Licenses," 46 Wayne L. Rev. 1735, 1736 (2000); see also W. Tanenbaum, "Current Topics in Software Licensing," in Practising Law Institute Series No. G-620: Understanding the Intellectual Property License (2000) p. 100 (discussing rise of end user licenses in software distribution market). Often called "mass-market licenses," "click wrap licenses" or "shrink-wrap licenses," these licenses require an end user to accept various terms as a precondition to downloading or using the specified software program. See, e.g., C. McManis, "The Privatization (or 'Shrink-Wrapping') of American Copyright Law," 87 Cal. L. Rev. 173, 174–75 (1999). "In placing a shrinkwrap license provision on its software product, the producer seeks to 1) prohibit unauthorized copies; 2) prohibit software rental; 3) prohibit reverse engineering and modifications to the software; 4) limit the use of the software to one central processing unit; 5) disclaim warranties; and 6) limit liability." J. Rolling, "The UCC Under Wraps: Exposing the Need for More Notice to Consumers of Computer Software with Shrinkwrapped Licenses," 104 Com. L.J. 197, 210–11 n.76 (1999).

[8] As the trial court noted, this case is one of many state antitrust actions that has been instituted following the decision in *United States* v. *Microsoft Corp.*, 84 F. Sup. 2d 9 (D.D.C. 1999) (findings of fact), and *United States* v. *Mircosoft Corp.*, 87 F. Sup. 2d 30, 35 (D.D.C. 2000) (conclusions of law), aff'd in part and rev'd in part, 253 F.3d 34 (D.C. Cir. 2001), in which the United States District Court for the District of Columbia held, inter alia, that the defendant had maintained a monopoly in the Intel compatible personal computer operating system market.

[9] The plaintiff's complaint contained three counts. In count one, the plaintiff alleged a violation of the Antitrust Act. Counts two and three, which were based on the same material factual allegations contained in the first count, set forth the plaintiff's CUTPA claims.

recover under the Antitrust Act and who, in the absence of a cause of action under the Antitrust Act, also was ineligible to recover under CUTPA. The trial court agreed with the defendant and granted the defendant's motion to strike the plaintiff's complaint. The trial court thereafter rendered judgment in favor of the defendant, from which the plaintiff appealed to the Appellate Court.[10] We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

## I

## ANTITRUST ACT

The plaintiff first claims that the trial court, in applying *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977) (*Illinois Brick*), improperly concluded that the plaintiff was an indirect purchaser of Windows 98 and, therefore, was barred from bringing an antitrust action pursuant to General Statutes § 35-35[11] to recover damages for the defendant's allegedly anticompetitive practices.[12] We agree with the trial court.

Before addressing the merits of the plaintiff's claim, we set forth the standard of review applicable to an appeal challenging the trial court's granting of a motion to strike. "A motion to strike challenges the legal suffi-

---

[10] The state office of the attorney general was granted permission to file an amicus curiae brief in this appeal. Thereafter, the Connecticut Business and Industry Association, the Association for Competitive Technology and the New England Legal Foundation were granted permission to file a joint amicus curiae brief.

[11] General Statutes § 35-35 provides in relevant part: "The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of . . . chapter [624] shall recover treble damages, together with a reasonable attorney's fee and costs."

[12] We note that the office of the attorney general, as amicus curiae, has adopted fully the plaintiff's arguments with respect to the plaintiff's antitrust claim.

ciency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997). We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); see also *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108–109, 491 A.2d 368 (1985). Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. *Waters* v. *Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996)." (Internal quotation marks omitted.) *Jewish Home for the Elderly of Fairfield County, Inc.* v. *Cantore*, 257 Conn. 531, 537–38, 778 A.2d 93 (2001).

## A

General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." We, therefore, begin our analysis of the plaintiff's antitrust claim with a discussion of federal antitrust law. Section 4 of the Clayton Act, 15 U.S.C. § 15, as amended, the statute on which § 35-35 is modeled, provides in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . ." 15 U.S.C. § 15 (a) (2000). The United States Supreme Court has interpreted § 4

of the Clayton Act as precluding an indirect purchaser of goods or services from bringing a private action against the seller who engages in anticompetitive practices in the sale of those goods or services. *Kansas* v. *Utilicorp United, Inc.*, 497 U.S. 199, 207, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990); *California* v. *ARC America Corp.*, 490 U.S. 93, 103, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989); see *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 730, 746–47; *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U.S. 481, 490–94, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968) (*Hanover Shoe*). Only those who purchase directly from such a seller may recover under the federal antitrust statutes. See, e.g., *Kansas* v. *Utilicorp United, Inc.*, supra, 207 (in distribution chain, indirect purchasers are not "immediate buyers" of antitrust defendant).

In *Hanover Shoe*, the defendant manufacturer and distributor of shoe making machinery argued that the plaintiff shoe manufacturer, though a direct purchaser, did not suffer a legally cognizable injury because the plaintiff had passed on the defendant's allegedly illegal overcharge to the individual purchasers of the plaintiff's shoes. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, supra, 392 U.S. 493, 487–88. We note that the term " '[p]ass on' is [used to describe] the process by which a middleman in the chain of distribution who has been overcharged by a manufacturer or by a producer adjusts his prices upward so as to pass on his increased costs to his own customers." Annot., 55 A.L.R. Fed. 919, 922 n.3 (1981). An antitrust defendant who asserts the pass on theory defensively attempts to prove that its allegedly illegal overcharge for goods or services did not cause the plaintiff a legally cognizable injury because the plaintiff had passed the overcharge onto the next economic actor in the vertical chain of distribution. See *Hanover Shoe, Inc.* v. *United Shoe Machinery*

*Corp.*, supra, 487–88; see also *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 724.

In *Hanover Shoe*, the court rejected the defendant's use of the pass on theory. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, supra, 392 U.S. 494. In so deciding, the court dismissed the defendant's contention that its anticompetitive practices did not cause the plaintiff injury, reasoning that "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." Id., 489; see also *New York* v. *Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988), cert. denied, 488 U.S. 848, 109 S. Ct. 128, 102 L. Ed. 2d 101 (1988) ("[i]n general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury . . . and hence may recover the entire amount of the illegal overcharge even if some or all of the overcharge may have been passed on to others").

The court's rejection of the defensive use of the pass on theory in *Hanover Shoe* rested on several fundamental concerns relating to the efficient enforcement of antitrust law. See generally *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, supra, 392 U.S. 490–94. The court understood that the defense would lead to an "insuperable difficulty" in measuring the extent to which the illegal overcharge has impacted the price of goods at each stage of distribution. Id., 492–93. In this regard, the court was especially mindful of the various factors influencing each company's respective pricing policies. Id., 492. As the court stated, "[n]ormally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general eco-

nomic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price." Id., 492–93. The court also expressed concern that the use of the pass on theory "would require additional long and complicated proceedings involving massive evidence and complicated theories"; id., 493; as antitrust defendants attempt to establish that plaintiffs have raised their prices in response to the illegal overcharges. Id., 493–94.

In *Hanover Shoe*, the court also alluded to some of the adverse consequences that would flow from permitting the defensive use of the pass on theory. For example, the court noted that "those who violate the antitrust laws by price fixing or monopolizing [should not] retain the fruits of their illegality because no one was available who would bring suit against them." Id., 494. The court keenly understood that the defensive use of the pass on theory would lead not only to greater complexity in the administration of antitrust actions, but also to a weakening of antitrust enforcement as defendants would attempt to escape liability merely by showing that the direct purchaser had passed on the illegal overcharge to the next level of purchasers in the distribution chain and, conversely, plaintiffs would attempt to prove that they had not passed on the overcharge. Id. As the court remarked, "if [direct] buyers are subjected to the [pass on] defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* customers. These ultimate customers, in [*Hanover Shoe*] the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action." (Emphasis in original.) Id. Lastly, the court rejected the defensive use of the pass on theory because it would substantially reduce the direct purchaser's incentive to bring a private antitrust action and, thus, the effectiveness of federal antitrust enforcement. Id.

In *Illinois Brick*, the court built upon its holding in *Hanover Shoe* and held that an indirect purchaser could not bring an antitrust action and offensively use the pass on theory to recover under § 4 of the Clayton Act. *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 735. In that case, the state of Illinois and 700 local governmental agencies in the greater Chicago area brought an action against several manufacturers and distributors of cement block alleging that the defendants engaged in price fixing. Id., 726–27. It is important to note that the plaintiffs themselves did not purchase the cement block from the defendant manufacturers and distributors. See id., 726. Rather, the cement block had been purchased by various masonry contractors who, in turn, were hired by various general contractors. Id. The plaintiffs had hired the general contractors to complete various construction projects in which the cement block ultimately was incorporated. Id. The plaintiffs in *Illinois Brick*, therefore, were indirect purchasers of cement block that already had passed through two levels in the chain of distribution before the product was incorporated into the plaintiffs' completed buildings and construction projects. Id. Nevertheless, the plaintiffs sought to recover the illegal overcharge that the masonry contractors had paid to the defendants by demonstrating that the masonry contractors incorporated the overcharge into their bids on the masonry portions of the construction projects submitted to the general contractors, and that the general contractors, in turn, had incorporated the masonry contractors' bids into their own bids to the plaintiffs, thereby passing on the defendants' illegal overcharge to the plaintiffs. Id., 727. In essence, the plaintiffs in *Illinois Brick* were attempting to use the pass on theory offensively to prove that the defendants' illegal conduct had caused their injuries.[13] See id., 728.

---

[13] To prove successfully that the antitrust defendant's conduct caused the plaintiff's injuries under the offensive use of the pass on theory, the plaintiff must proffer evidence showing how each economic actor between the defendant and the plaintiff in the chain of distribution had passed on the defen-

In *Illinois Brick*, the court rejected the plaintiffs' attempt to use the pass on theory for several reasons. Among those reasons was the court's concern that the offensive use of the pass on theory would "open the door to duplicative recoveries under § 4 [of the Clayton Act]." (Internal quotation marks omitted.) Id., 731. The court reasoned that "[a] one-sided application of *Hanover Shoe* substantially increases the possibility of inconsistent adjudications—and therefore of unwarranted multiple liability for the defendant—by *presuming* that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff [the indirect purchaser]; overlapping recoveries are certain to result from the two lawsuits unless the indirect purchaser is unable to establish any pass-on whatsoever."[14] (Emphasis in original.) Id., 730–31.

dant's overcharge, either wholly or in part, to the next actor in the chain, ultimately ending with the plaintiff. See J. Cirace, "Apportioning Damages Between Direct and Indirect Purchasers in Consolidated Antitrust Suits: *ARC America* Unravels the *Illinois Brick* Rule," 35 Vill. L. Rev. 283, 311–16 (1990) (discussing pass on theory). See generally W. Page, "The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of *Illinois Brick*," 67 Antitrust L.J. 1 (1999) (discussing pass on theory in context of class action suits).

[14] Notwithstanding the United States Supreme Court's concerns regarding the offensive use of the pass on theory, the court has recognized, at least in dictum, two narrow exceptions to the direct purchaser rule: when the direct purchaser and the indirect purchaser have entered into a cost-plus contract; *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 732 n.12, 736; *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, supra, 392 U.S. 494; and when the indirect purchaser wholly owns and controls the direct purchaser. *Illinois Brick Co.* v. *Illinois*, supra, 736 n.16. In the cost-plus contract situation, the use of the pass on theory is unnecessary because "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." Id., 736. Similarly, when the indirect purchaser owns and controls the direct purchaser, the two are one and the same, making any apportionment of damages irrelevant. We note that neither of these exceptions is relevant to the present appeal.

The court in *Illinois Brick* further grounded its rejection of the offensive use of the pass on theory on concerns that its application would result in additional administrative costs to the judicial system and the inefficient enforcement of federal antitrust law. Id., 731–32; see also id., 745 ("[t]he combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement"). As the court stated, "[t]his perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants. However long and complicated the proceedings would be when defendants sought to prove pass-on . . . they would be equally so when the same evidence [is] introduced by plaintiffs. Indeed, the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution. The demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." (Citation omitted; internal quotation marks omitted.) Id., 732–33. The court ultimately was concerned that allowing indirect purchasers to sue and, thereby, prove their damages under the pass on theory, "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers." Id., 737. Therefore, the federal courts have limited recovery under § 4 of the Clayton

Act to those consumers who are direct purchasers in relation to the antitrust defendant.

B

We next examine the relationship between Connecticut and federal antitrust law. The Antitrust Act, like federal antitrust law, attempts to promote competition in the marketplace. E.g., *Shea* v. *First Federal Savings & Loan Assn. of New Haven*, 184 Conn. 285, 294, 439 A.2d 997 (1981). "The legislative history of the [Antitrust] [A]ct clearly establishes that it was intentionally patterned after the antitrust law of the federal government. See 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4182, remarks of Representative David H. Neiditz ('this bill gives Connecticut an [antitrust] [l]aw similar to the existing [f]ederal [antitrust] [l]aw in every respect'); 14 S. Proc., Pt. 7, 1971 Sess., p. 3211, remarks of Senator William J. Sullivan ('[the proposed legislation] gives the small businessman the protection afforded to the large corporations under the [f]ederal [antitrust] [a]ct')." *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15, 664 A.2d 719 (1995). Accordingly, General Statutes § 35-35 provides that "[t]he state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of . . . chapter [624] shall recover treble damages, together with a reasonable attorney's fee and costs."[15]

The legislature amended the Antitrust Act in 1992 to make explicit its intent that the judiciary shall interpret

[15] Compare § 35-35 with § 4 of the Clayton Act, as amended, which provides in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . ." 15 U.S.C. § 15 (a) (2000).

the Antitrust Act in accordance with the federal courts'
interpretation of federal antitrust law.[16] *Westport Taxi
Service, Inc.* v. *Westport Transit District,* supra, 235
Conn. 15 n.17; see Public Acts 1992, No. 92-248, § 2
(P.A. 92-248) (codified at General Statutes § 35-44b).
Thus, the Antitrust Act mandates "that in construing
[the Antitrust Act], the courts of this state shall be
guided by interpretations given by the federal courts
to federal antitrust statutes." General Statutes § 35-44b;
cf. *Shea* v. *First Federal Savings & Loan Assn. of New
Haven,* supra, 184 Conn. 303 (judicial opinions interpre-
ting federal antitrust statutes aid this court's construc-
tion of Antitrust Act). Notwithstanding this mandate,
the plaintiff argues that § 35-44b is irrelevant to our
determination of the issue presented by this appeal
because the inclusion of the term "consumer" in § 35-
35 renders the statute textually different from § 4 of

---

[16] In support of Public Acts 1992, No. 92-248, of which § 2 is codified at
General Statutes § 35-44b, Representative Thomas G. Moukawsher, a spon-
sor of the bill, stated: "Antitrust laws originally were enacted at a time when
American and Connecticut corporations were, in many ways, [too] dominant
nationwide . . . [a]nd internationally, to provide fair competition . . .
within the United States and without the United States. Today, some of the
problems have changed, in terms of international competition . . . [a]nd
we're trying to do some things to make changes to keep up with the
times. . . .

"The second part of the bill would mirror what Connecticut has done
with unfair trade practices. Under [CUTPA], a Connecticut [court] looks to
[f]ederal Unfair Trade Practices Act . . . jurisprudence. This would attempt
to do the same thing with antitrust law . . . [t]he goal being to have a single
antitrust jurisprudence in the United States. This is vital if corporations are
going to be able to make critical decisions about research and development
projects . . . that they may undertake . . . [a]s well as corporate ventures
in general, where antitrust laws may pose an obstacle. This would allow
them to look to a single case law jurisprudence . . . in order to know
whether they're in compliance with our laws . . . . Currently, a corporation
in Connecticut or elsewhere . . . may have to look to [fifty] different sets
of jurisprudence. This would move towards a national jurisprudence, and
I believe it will strongly enhance the international competitiveness of Con-
necticut, and of American manufacturing and research companies, wherever
they may be." 35 H.R. Proc., Pt. 7, 1992 Sess., pp. 2386–87.

the Clayton Act. The plaintiff further contends that our adherence to the direct purchaser rule of *Illinois Brick* would render the term "consumer" superfluous. We disagree.

Any question regarding the textual difference between the federal and state statutes as a result of the inclusion of the term "consumer" in § 35-35, on the one hand, and the absence of that term in § 4 of the Clayton Act, on the other hand, was resolved in *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 340–42, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979), in which the United States Supreme Court held that consumers may recover damages under § 4 of the Clayton Act for noncommercial injuries caused by a defendant's antitrust violations.[17] In *Reiter*, the plaintiff,[18] a retail purchaser of hearing aids, sought to recover damages from the defendant hearing aid manufacturers. Id., 335. The plaintiff alleged that the manufacturers had committed various antitrust violations including engaging in illegal vertical and horizontal price fixing of hearing aids and related services. Id. Specifically, the plaintiff alleged that the manufacturers conspired "among[st] themselves and with their retail dealers to fix the retail prices of the hearing aids."

[17] It is important to note the procedural posture pursuant to which the United States Supreme Court entertained the appeal in *Reiter* and the fact that the court did not address whether the direct purchaser rule of *Illinois Brick* had barred the plaintiff's claims. See *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 337 n.3. First, the court had granted certiorari on the issue of whether a consumer alleging noncommercial injuries may recover under § 4 of the Clayton Act, which arose from an interlocutory order that the District Court had certified to the Eighth Circuit Court of Appeals. Id., 334–36. Second, the court explained in a footnote that the Eighth Circuit Court of Appeals expressly had declined to address whether the plaintiff's claim for treble damages was barred by the direct purchaser rule and, therefore, that issue was not before the United States Supreme Court on appeal. Id., 337 n.3; see also footnote 19 of this opinion.

[18] The plaintiff in *Reiter* brought a class action on behalf of herself and other retail purchasers of hearing aids. *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 335.

Id., 335 n.1. Certain manufacturers moved to dismiss the complaint on the ground that the plaintiff lacked standing to sue under § 4 of the Clayton Act because she "had not been injured in her 'business or property' within the meaning of [§ 4 of] the [Clayton] Act"; id., 335; and, consequently, her injuries were not commercial. See id. The District Court disagreed with the manufacturers and "held that under § 4 [of the Clayton Act] a retail purchaser is injured in 'property' if the purchaser can show that antitrust violations caused an increase in the price paid for the article purchased." Id.; see *Reiter* v. *Sonotone Corp.*, 435 F. Sup. 933, 936–38 (D. Minn. 1977). The District Court then certified the issue for interlocutory review. *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 336.

On appeal, the Eighth Circuit Court of Appeals reversed the District Court and held that retail purchasers of consumer goods or services who do not allege a commercial or business related injury are not injured in their business or property within the meaning of § 4 of the Clayton Act.[19] Id.; *Reiter* v. *Sonotone Corp.*, 579 F.2d 1077, 1086, 1087 (8th Cir. 1978). The United States Supreme Court reversed the Eighth Circuit Court of

---

[19] In so deciding, the Eighth Circuit Court of Appeals declined to address whether the direct purchaser rule of *Illinois Brick* had barred the plaintiff's claims, noting that "[the plaintiff] did not purchase [the] hearing aids directly from the manufacturers. In *Illinois Brick* . . . the [United States] Supreme Court held that only direct purchasers may sue for treble damages under § 4 of the Clayton Act. The [c]ourt recognized, however, that indirect purchasers may maintain actions involving cost-plus contracts as well as those in which market forces have been superseded [as when] the direct purchaser is owned or controlled by its customer. . . .

"[The plaintiff] contend[s] that the manufacturers in [*Reiter*] engaged in various prohibited vertical restraints including resale price maintenance. In view of [the court's] holding that ordinary consumers may not maintain treble damage actions, we need not decide whether [the manufacturers'] alleged violations constitute an exception to *Illinois Brick*." (Citations omitted; internal quotation marks omitted.) *Reiter* v. *Sonotone Corp.*, 579 F.2d 1077, 1079 n.3 (8th Cir. 1978).

Appeals, holding that "[a] consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his . . . property' within the meaning of § 4 [of the Clayton Act]." *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 339; see also *Associated General Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 529 n.19, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) (acknowledging holding in *Reiter* that consumers may maintain action under § 4 of Clayton Act); *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465, 473, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982) (discussing holding in *Reiter* that consumers have standing under § 4 of Clayton Act to seek damages for increase in purchase price caused by price-fixing conspiracy). In construing the language of § 4 of the Clayton Act, the court in *Reiter* reiterated that, in using the phrase "any person," Congress "intend[ed] [that] it . . . have its naturally broad and inclusive meaning." (Internal quotation marks omitted.) *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 338, quoting *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308, 312, 98 S. Ct. 584, 54 L. Ed. 2d 563 (1978). The court further concluded that the term "property" in § 4 of the Clayton Act has a similarly broad meaning and that money is a form of property. *Reiter* v. *Sonotone Corp.*, supra, 442 U.S. 338.

Thus, § 4 of the Clayton Act provides a remedy for those consumers who have been injured by a defendant's antitrust practices. See, e.g., *California* v. *California & Hawaiian Sugar Co.*, 588 F.2d 1270, 1273 (9th Cir. 1978), cert. denied, 441 U.S. 932, 99 S. Ct. 2052, 60 L. Ed. 2d 660 (1979) ("a consumer class [i.e., a class] not composed of direct purchasers . . . cannot claim under the Clayton Act that overcharges had been passed on to them by those selling to them"). We conclude that allowing only those consumers who purchase directly from the antitrust defendant to bring suit under our

state antitrust law ensures that the Antitrust Act remains harmonious with federal antitrust statutes.

## C

In so deciding, we disagree with the plaintiff's contention that the legislative history of § 35-35 supports the plaintiff's right to sue under the Antitrust Act.[20] To the contrary, the legislative history makes clear that the legislature intended to "[give] Connecticut an [antitrust] [l]aw similar to the existing [f]ederal [antitrust] [l]aw in every respect . . . ."[21] 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4182, remarks of Representative Neiditz. By adopting the direct purchaser rule, we not only follow that legislative intent, but also the intent expressed in § 35-44b.

Additionally, we are mindful of the existence of so-called *Illinois Brick* repealer bills[22] that have surfaced in the legislature over the last several decades but that have not been enacted. See Raised Bill No. 1262, 2001 Sess.; Raised Bill No. 7052, 1991 Sess.; Raised Commit-

---

[20] The plaintiff relies on *Hyde* v. *Abbott Laboratories, Inc.*, 123 N.C. App. 572, 473 S.E.2d 680, review denied, 344 N.C. 734, 478 S.E.2d 5 (1996), and *Blake* v. *Abbott Laboratories, Inc.*, No. 03A01-9509-CV-00307, 1996 WL 134947 (Tenn. App. 1996), for the proposition that appellate case law from other jurisdictions supports his right to sue. Such reliance is misplaced, however, since neither North Carolina nor Tennessee statutorily require their state courts to follow federal court interpretations of federal antitrust statutes in construing their respective state statutes. See generally N.C. Gen. Stat. §§ 75-1 through 75-35 (1999); Tenn. Code Ann. §§ 47-25-101 through 47-25-112 (2001).

[21] Although we agree with the plaintiff that *Illinois Brick* was decided after passage of the Antitrust Act, and, thus, presumably, an indirect purchaser could have sued under federal and state antitrust law before the date of that decision, the legislative history of the Antitrust Act clearly demonstrates the legislature's intent that the Antitrust Act be interpreted in accordance with the federal courts' interpretation of federal antitrust law. Moreover, this legislative intent is codified at § 35-44b. We, therefore, reject the plaintiff's contention that the Antitrust Act should be interpreted in accordance with the state of federal antitrust law existing at the time that the Antitrust Act was passed.

[22] These bills are so-called because their purpose is to nullify at the state level the United States Supreme Court's holding in *Illinois Brick*.

tee Bill No. 825, § 2, 1987 Sess.; Raised Committee Bill No. 88, § 1, 1984 Sess.; Raised Committee Bill No. 1119, § 1, 1983 Sess.;[23] Raised Committee Bill No. 1159, § 1, 1981 Sess.; Raised Committee Bill No. 1575, § 4, 1979 Sess. As early as 1979, this state's office of the attorney general had proposed amending the Antitrust Act to allow an indirect purchaser to bring a claim pursuant to the Antitrust Act. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1979 Sess., p. 749, remarks of Attorney General Carl R. Ajello. Had the legislature enacted Raised Committee Bill No. 1575 in 1979, § 35-35 would have been repealed in favor of the following statutory language: "The state or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter may sue [therefor] regardless of whether the state or any such person dealt directly or indirectly with the defendant and shall recover treble damages, together with a reasonable attorney's fee and costs." Raised Committee Bill No. 1575, § 4, 1979 Sess.

---

[23] On May 24, 1983, Raised Committee Bill No. 1119 was defeated in the Senate by a vote of twenty to fourteen. 26 S. Proc., Pt. 10, 1983 Sess., pp. 3300–3301. Before the vote had been taken, however, Sentator Howard T. Owens, Jr., one of the bill's sponsors, explained the purpose of the bill as follows: "We develop [antitrust] laws so that the consumer in the state can, in fact, be protected. However, part of the problem that we have with this is a case that came down from the United States Supreme Court back in 1977 called [*Illinois Brick*]. That case in effect said that purchasers who do not buy directly from the [antitrust] violator or violators are denied recovery under the [f]ederal [antitrust] law . . . .

"They are saying that the only ones who have the right to bring suits under the [antitrust] laws are those who have been directly [a]ffected or have . . . lost directly from the [antitrust] violator. . . . [T]his bill would give indirect purchasers a remedy under the [s]tate's [antitrust] law and would allow the [antitrust] violator if in fact [he has] committed a violation, a defense that the plaintiff purchaser passed on all or part of the claimed overcharge or underpayment to another purchaser or seller. . . .

"This [b]ill would allow the attorney general or individuals who had been [a]ffected even though they were not the direct purchasers, to bring suit and to recover damages if need be." 26 S. Proc., Pt. 10, 1983 Sess., pp. 3298–99.

Since 1979, similar *Illinois Brick* repealer bills have been introduced in the legislature, yet, notwithstanding the unwavering support of the attorney general's office; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 2001 Sess., pp. 1672–75, remarks of Attorney General Richard Blumenthal (supporting passage of Raised Bill No. 1262, 2001 Sess.); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1991 Sess., pp. 442–49, remarks of Richard Kehoe, special counsel to Attorney General Blumenthal (supporting passage of Raised Bill No. 7052, 1991 Sess.); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1987 Sess., pp. 177–79, remarks of Gordon Hall, legal counsel and legislative liaison to Attorney General Joseph I. Lieberman (supporting passage of Raised Committee Bill No. 825, 1987 Sess.); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1984 Sess., pp. 64–65, remarks of Attorney General Lieberman (supporting passage of Raised Committee Bill No. 88, 1984 Sess.); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1983 Sess., pp. 1563–65, 1654–56, remarks of Assistant Attorney General Robert M. Langer and written testimony of Attorney General Lieberman, respectively (both supporting passage of Raised Committee Bill No. 1119, 1983 Sess.); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1981 Sess., pp. 520–21, 523, remarks of Assistant Attorney General Langer (supporting passage of Raised Committee Bill No. 1159, 1981 Sess.); none has been enacted into law. "We have previously acknowledged the inferential value of failed attempts to amend existing laws with respect to the intent of the legislature to acquiesce in prevailing judicial interpretations of such laws." *Enquist* v. *General Datacom*, 218 Conn. 19, 42 n.11, 587 A.2d 1029 (1991). In the present case, that inference is strengthened by the number of proposed *Illinois Brick* repealer bills that have failed to become law.

The inference is further strengthened by the specificity of the testimony of the attorney general and his agents before the judiciary committee in support of each failed bill. The crux of that testimony gravitates toward one recurring theme, namely, that without such an amendment to the Antitrust Act, *Illinois Brick* bars an indirect purchaser from bringing a claim under Connecticut law because we look to federal interpretation of federal antitrust statutes in interpreting the Antitrust Act. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 2001 Sess., p. 1673, remarks of Attorney General Blumenthal ("I've talked publicly about our state's failure to adopt [a law] . . . that would overcome the disadvantages and harm that are done by the *Illinois* [*Brick*] case . . . that requires . . . direct privity in order to recover");[24] Conn. Joint

[24] We note that the position of the office of the attorney general, as set forth in its May 2, 2001 amicus curiae brief submitted to this court, regarding the applicability of *Illinois Brick* to the Antitrust Act is inconsistent with the position that it had taken before the judiciary committee in March, 2001. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 2001 Sess., p. 1988.

In its amicus curiae brief, the office of the attorney general adopts the plaintiff's argument that the Antitrust Act does not embrace the direct purchaser rule of *Illinois Brick*. In written testimony submitted to the judiciary committee in support of Senate Bill No. 1262, 2001 Sess., however, Attorney General Blumenthal explained: "Generally, if someone violates a law and injures another person, that violator is liable for damages. A frequent, unfortunate exception concerns the antitrust laws. Under Connecticut law, a consumer, a business, even the state, cannot recover for the harm caused by a violator of our antitrust laws *unless* the consumer, business or the state purchased a product or service *directly* from the violator.

"In antitrust cases, when competing manufacturers conspire to fix prices, a middleman purchases the goods at a higher price and passes that higher price onto the consumer. The consumer is ultimately harmed but cannot recover from the manufacturer. Only the middleman can recover damages but the middleman has passed along the higher costs to the consumer and has suffered little, if any, harm. Thus, this anomaly in the law harms anyone who is an indirect purchaser, including retailers, to small businesses, union health plans, and ordinary consumers.

"Senate Bill 1262 simply provides that any person who is harmed by the actions of an antitrust violator may recover damages from the violator of our laws. . . . This type of legislation has been passed in [twenty-one]

Standing Committee Hearings, Judiciary, Pt. 2, 1991 Sess., p. 443, remarks of Richard Kehoe ("[w]hat this bill would do is allow indirect purchasers and most likely municipalities . . . if they suffer damages to sue the price fixer and collect those damages"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1987 Sess., pp. 178–79, remarks of Gordon Hall ("[the proposed legislation] would allow an antitrust action for indirect purchasers"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1984 Sess., p. 64, remarks of Attorney General Lieberman ("This bill will amend our [antitrust] statutes to permit consumers, businesses, municipalities, and the [s]tate, as indirect purchasers, to sue to collect damages from antitrust violators. [This proposed legislation] . . . will counteract at the [s]tate level the controversial results from the United States Supreme Court decision in . . . [*Illinois Brick*] . . . ."); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1983 Sess., p. 1655, written testimony of Attorney General Lieberman ("[i]f this bill becomes law, Connecticut will . . . achieve, under state law, what Congress has conspicuously failed to accomplish"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1981 Sess., p. 520, remarks of Assistant Attorney General Langer ("[w]hat this particular [bill] achieves is the nu[ll]ification at the state level of . . . [*Illinois Brick*]"); Conn. Joint Committee Hearings, Judiciary, Pt. 3, 1979 Sess., p. 749, remarks of Attorney General Ajello ("the *Illinois Brick* case . . . cast[s] a shadow of doubt, certainly, over the ability of an ultimate consumer to bring suit"). Notwithstanding the plaintiff's argument to the contrary, which the office

states . . . .

"In stark contrast, the state of Connecticut and Connecticut businesses and consumers have been denied the ability to recover millions of dollars in damages from antitrust violations because we have not passed Senate Bill 1262, allowing indirect purchasers to sue for damages." (Emphasis in original.) Id.

of the attorney general has adopted as its own; see footnote 24 of this opinion; we believe that the legislature's refusal to enact legislation authorizing indirect purchasers to sue under the Antitrust Act, coupled with its enactment of P.A. 92-248, § 2 (codified at § 35-44b), which expressly provides that we are to be guided by federal court interpretation of federal antitrust statutes—including, by implication, the United States Supreme Court's decision in *Illinois Brick*—amply supports our conclusion that an indirect purchaser may not recover under the Antitrust Act.

### D

Turning to the plaintiff's complaint, we conclude that the plaintiff alleged sufficient facts for the trial court to determine, as it did, that the plaintiff is an indirect purchaser of Windows 98 and, consequently, that he is barred from bringing an antitrust claim under § 35-35. The plaintiff alleged that he "purchased an Intel-based personal computer from Staples in Wallingford onto which Windows 98 was preinstalled." Nowhere in his complaint did the plaintiff allege that he directly purchased Windows 98 from the defendant. Rather, the plaintiff alleged that the defendant charged original computer equipment manufacturers[25] different prices for their respective licenses to Windows 98. The plaintiff also alleged that "[original computer equipment manufacturers] and distributors of upgrade CD ROMs have treated [the defendant's] monopoly price for Windows 98 as an element of their cost and have passed most, if not all, of [the defendant's] monopoly price onto [the] plaintiff and [other similarly situated buyers]." The mere fact that a direct purchaser, such as an original computer equipment manufacturer or a retailer like

---

[25] Original computer equipment manufacturers generally sell computers consisting of bundled software and hardware components from different manufacturers to retailers and end users. See, e.g., M. Lemley et al., Software and Internet Law (2000) p. 1096.

Staples, has passed on most or all of the defendant's illegal overcharge does not vault the plaintiff into the status of a direct purchaser. See, e.g., *Kansas* v. *Utilicorp United, Inc.*, supra, 497 U.S. 207; *New York* v. *Hendrickson Bros., Inc.*, supra, 840 F.2d 1079. The fact remains that the plaintiff purchased from a retailer, not the defendant, a personal computer onto which Windows 98 had been preinstalled.[26]

The plaintiff nevertheless contends that the direct purchaser rule is inapplicable because he is an end user licensee of Windows 98 and, thus, in privity with the defendant. This argument fundamentally misunderstands the import of the court's holding in *Illinois Brick*. The rationale underlying *Illinois Brick* and its progeny is that restricting standing to a *direct purchaser* who has purchased goods *directly* from the anti-

---

[26] It is important to note that, under the end user license agreement for the defendant's computer operating systems, the plaintiff is not only recognized as a licensee of both the defendant and the manufacturer of his computer system, but also as an indirect purchaser of Windows 98. Accordingly, the end user license agreement provides in relevant part: "This End-User License Agreement ('EULA') is a legal agreement between you . . . and the manufacturer ('Manufacturer') of the computer system or computer system component ('HARDWARE') with which you acquired the Microsoft software product(s) identified above ('SOFTWARE PRODUCT' or 'SOFTWARE'). . . . By installing, copying, downloading, accessing or otherwise using the SOFTWARE PRODUCT, you agree to be bound by the terms of this EULA. If you do not agree to the terms of this EULA, Manufacturer and Microsoft Licensing, Inc. ('MS') are unwilling to license the SOFTWARE PRODUCT to you. In such event, you may not use or copy the SOFTWARE PRODUCT, and you should promptly contact Manufacturer for instructions on return of the unused product(s) for a refund. . . ."

The end user license agreement for the defendant's computer software similarly provides in relevant part: "This Microsoft End-User License Agreement ('EULA') is a legal agreement between you . . . and Microsoft Corporation for the Microsoft software product identified above . . . . By installing, copying, downloading, accessing or otherwise using the SOFTWARE PRODUCT, you agree to be bound by the terms of this EULA. If you do not agree to the terms of this EULA, do not install or use the SOFTWARE PRODUCT; you may, however, return it to your place of purchase for a full refund. . . ."

trust defendant will maximize the effective enforcement of antitrust statutes "by concentrating the full recovery for the overcharge in the direct purchasers . . . ." *Illinois Brick Co.* v. *Illinois,* supra, 431 U.S. 735. Thus, the court's focus was on the underlying economic transaction between the direct purchaser and the antitrust defendant and not, as the plaintiff contends, whether the plaintiff and the defendant were in contractual privity by virtue of a licensing agreement. The plaintiff alleges nowhere in his complaint that he was required to pay the defendant for the acquisition of the licensing rights to use Windows 98. Thus, there is no economic relationship between the plaintiff and the defendant for purposes of the direct purchaser rule of *Illinois Brick.* We, therefore, reject the plaintiff's argument that his status as an end user licensee obviates any inquiry into whether the plaintiff is an indirect purchaser. We conclude that the trial court properly granted the defendant's motion to strike count one of the plaintiff's complaint setting forth his claim under § 35-35 of the Antitrust Act.

## II

### CUTPA

The plaintiff also challenges that part of the trial court's judgment striking the plaintiff's CUTPA claims made pursuant to General Statutes §§ 42-110b[27] and 42-110g.[28] As we previously noted, these claims were predi-

---

[27] General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

[28] General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper. . . ."

cated on the same factual allegations underlying the plaintiff's state antitrust claim. The trial court struck the CUTPA claims on the ground that it "ha[d] no authority to embark on a path" that would undermine the United States Supreme Court's policy choices expressed in *Illinois Brick*. The plaintiff contends that the trial court's reasoning conflicts with CUTPA's remedial intent and imposes a privity requirement that the legislature previously had removed from the statutory scheme. Relying on *California* v. *ARC America Corp.*, supra, 490 U.S. 93, the plaintiff further argues that the trial court identified an inconsistency between federal and state law that does not exist inasmuch as federal antitrust law does not preempt state statutes that authorize the recovery of damages by indirect purchasers.[29]

We find the plaintiff's reliance on *California* v. *ARC America Corp.*, supra, 490 U.S. 93, misplaced. In that case, the United States Supreme Court considered whether federal antitrust law preempted state indirect purchaser statutes, that is, state statutes authorizing indirect purchasers to recover for overcharges passed on to them by direct purchasers in violation of state antitrust law. See generally id., 100–101. In holding that such statutes were not preempted, the court reasoned that the congressional purposes underlying the direct purchaser rule, which the court identified in *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 720, namely, the avoidance of unnecessarily complicated antitrust actions; see id., 732–33, 741, 745; the encouragement of vigorous federal antitrust enforcement by providing direct purchasers incentives to bring antitrust actions; see id., 734–35, 745, 747; and the avoidance of multiple liability; see id., 730–31, 737–38; did not govern state

---

[29] Following oral argument before this court, we ordered, sua sponte, the parties to brief the following issue: "Does the plaintiff have standing to maintain his CUTPA claim in light of [this] court's decision in *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001)?"

antitrust statutes. *California* v. *ARC America Corp.*, supra, 105–106 ("[t]he congressional purposes on which *Illinois Brick* was based provide no support for a finding that state indirect purchaser statutes are pre-empted by federal law").

The fact that federal law does not preclude states from authorizing indirect purchasers to recover damages for antitrust violations is irrelevant to the present analysis, however, because our legislature has expressed the intent that Connecticut's antitrust law be interpreted harmoniously with federal antitrust law. General Statutes § 35-44b. Under federal law, an indirect purchaser may not recover under § 4 of the Clayton Act for a defendant's antitrust violations. See, e.g., *Kansas* v. *Utilicorp United, Inc.*, supra, 497 U.S. 207. Likewise, we concluded in part I of this opinion that an indirect purchaser cannot recover damages under this state's Antitrust Act. Therefore, the issue before this court is not whether federal law preempts state antitrust law but, rather, whether an indirect purchaser who is barred from recovering under our *state* antitrust law may nonetheless recover under CUTPA for the same allegedly anticompetitive conduct.

The plaintiff contends that "by abolishing CUTPA's privity requirement our legislature made clear its intent that indirect purchaser-consumers be allowed to bring CUTPA claims." The plaintiff, however, has directed us to no authority, including any part of the legislative history of Public Acts 1979, No. 79-210, § 1 (P.A. 79-210), pursuant to which the privity requirement of § 42-110g was eliminated, in support of his claim.[30] Moreover,

---

[30] Notwithstanding the failure of the plaintiff to provide any authority to support his argument, we previously have stated that "[t]he legislative history does . . . indicate that [P.A. 79-210] was intended to make privity less of an obstacle to recovery under CUTPA. Arnold Feigen, assistant attorney general, noted in the debates concerning [P.A. 79-210] in the legislature that: '[the proposed legislation] deletes references to the phrase "such seller or lessor in the private section of [CUTPA]." . . . The [proposed legislation] will now allow a suit by any person who suffers any ascertainable loss of

our own examination of the legislative history of P.A. 79-210 has not uncovered any such legislative intent. Nevertheless, we previously have held that, with the removal of CUTPA's privity requirement, the legislature did not intend to displace the remoteness doctrine as a standing requirement with CUTPA's ascertainable loss requirement. *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 373, 780 A.2d 98 (2001). We, therefore, reject the plaintiff's claim that the elimination of CUTPA's privity requirement from § 42-110g (a) a fortiori compels us to conclude that the plaintiff, as an indirect purchaser, has standing to pursue his CUTPA claims arising out of the defendant's allegedly anticompetitive conduct.[31]

"In 1973, when CUTPA was first enacted, the predecessor to § 42-110g contained language that limited standing to '[a]ny person who purchases or leases goods

money or property. Numerous arguments have been raised in both state and federal courts that the plaintiff, in order to sue, must be a purchaser or a lessee of a seller or lessor. Clarification of [§] 42-110g (a) is essential in order to avoid needless litigation of the particular phrase now found in the statute.' Conn. Joint Standing Committee Hearings, [General Law], Pt. 4, 1979 Sess., p. 1159, remarks of Arnold Feigen, assistant attorney general, in support of Raised Committee Bill No. 7810." *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 724–25, 627 A.2d 374 (1993).

[31] In *Ganim*, we offered the following illustration, which is applicable to the present case: "Consider, for example, that deceitful merchant A causes B to lose a great deal of money, as a result of which B defaults on a large loan from C, as a result of which C's business fails, as a result of which C's creditors D, E, F and G each suffers an ascertainable loss of money." *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 373 n.21. Under the plaintiff's reasoning, namely, that CUTPA is a remedial statute without a privity requirement, B, C, D, E, F and G all would have standing to pursue CUTPA claims against A. Likewise, under the plaintiff's reasoning, all persons or entities in the chain of distribution of Windows 98 including all end user licensees of Windows 98, all of whom are indirect purchasers, would have standing to pursue CUTPA claims predicated on the defendant's allegedly anticompetitive conduct as long as they could demonstrate that the defendant's allegedly illegal overcharge was either wholly or partially passed onto them. We do not think that the legislature intended such a result when it removed CUTPA's privity requirement in P.A. 79-210.

or services . . . .' Public Acts 1973, No. 73-615, § 7. In 1979, however, the legislature amended [CUTPA], deleting all references to 'purchasers, sellers, lessors, or lessees.' [P.A. 79-210], § 1." *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 724, 627 A.2d 374 (1993). Notwithstanding the elimination of the privity requirement, we previously have stated that "it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any trade or commerce." (Internal quotation marks omitted.) Id., 725–26. Thus, notwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation[32] to determine whether a party has standing to bring an action under CUTPA. See, e.g., *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 372–73; *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 306–308, 692 A.2d 709 (1997); *Haesche* v. *Kissner*, 229 Conn. 213, 222–24, 640 A.2d 89 (1994).

Accordingly, in *Ganim*, we held, inter alia, that the harms alleged by the plaintiffs, the city of Bridgeport and its mayor, against the defendant firearms manufacturers, trade associations and retail sellers were too remote and derivative with respect to the defendants' conduct in designing, marketing and selling firearms; *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn.

---

[32] We previously have explained the concept of proximate cause as follows: "Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's action to their ultimate end, if end there is." (Internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 350–51, quoting *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999), cert. denied, 528 U.S. 1080, 120 S. Ct. 799, 145 L. Ed. 2d 673 (2000).

344; and, consequently, the plaintiffs lacked standing to assert their claims, including a CUTPA claim, for their alleged injuries. Id., 365, 372–73. In *Ganim*, the city and mayor of Bridgeport brought an action in nine counts against the defendants alleging, inter alia, that the defendants' design, marketing and sale of firearms had victimized city residents and contributed to an increase in city crime, resulting in, inter alia, higher expenses related to policing and emergency and social services. Id., 327. The plaintiffs sought to recover pursuant to the Connecticut Product Liability Act, General Statutes § 52-572m et seq., and CUTPA. *Ganim* v. *Smith & Wesson Corp.*, supra, 325–26. The plaintiffs also set forth common-law claims of public nuisance, negligence, unjust enrichment and civil conspiracy. Id., 326.

In concluding that the city and mayor of Bridgeport lacked standing because their injuries were too remote with respect to the defendants' conduct, we employed a three part policy analysis used by the "[federal] courts in their application of the general principle that plaintiffs with indirect injuries lack standing to sue . . . . First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary whe[n] there are directly injured parties who can remedy the harm without these attendant problems." (Citation omitted; internal quotation marks omitted.) Id., 353. These considerations are similar to those

on which the direct purchaser rule of *Illinois Brick* rests.[33]

Applying the three part policy analysis to the facts of the present case, we are convinced that the plaintiff's claimed injuries are too indirect and remote with respect to the defendant's allegedly anticompetitive conduct for the plaintiff to recover under CUTPA. Turning to the first factor in the analysis, we highlight the numerous links in the chain of distribution that separate the plaintiff's claimed damages, namely, that he had paid a monopoly price for the defendant's Windows 98 software, from the defendant's alleged conduct. According to the plaintiff's complaint, the plaintiff had purchased from a retailer a personal computer onto which Windows 98 had been preinstalled. As we noted in part I of this opinion, the plaintiff's complaint is bereft of any facts tending to demonstrate that the plaintiff's injuries were a direct result of the defendant's conduct.

Considering the fact that Windows 98 was preinstalled onto a personal computer that the plaintiff had purchased from a retailer in combination with the allegation that the defendant had sought to induce original computer equipment manufacturers, such as IBM, Gateway, Compaq, Dell and Hewlett-Packard, to install Windows 98 onto their respective computer systems, we identify at least one additional known link separating the defendant's conduct from the plaintiff's alleged injury. The plaintiff also alleged in his complaint that the original computer equipment manufacturers and

---

[33] Compare the three part policy analysis we employed in *Ganim* with the policy reasoning of the direct purchaser rule articulated by the United States Supreme Court in *Hanover Shoe* and *Illinois Brick*: (1) the difficulty in determining the amount of an overcharge that the direct purchaser had passed onto indirect purchasers; (2) the risk of multiple recoveries; and (3) allowing only direct purchasers to bring private actions promotes vigorous enforcement of antitrust laws. E.g., *Kansas* v. *Utilicorp United, Inc.*, supra, 497 U.S. 208, 212, 214.

distributors had factored the price of Windows 98 into their costs and had "passed most, if not all, of [the defendant's] monopoly price on to [the] plaintiff and [all other similarly situated end user licensees]." Accordingly, the plaintiff traces his injuries to the defendant by virtue of the following chain of events: first, the defendant illegally overcharged the original computer equipment manufacturers for licenses to install Windows 98 onto the computers that they had manufactured; second, the manufacturers factored the overcharges into their costs when they priced and sold to retailers the computers onto which Windows 98 had been preinstalled; and third, retailers passed on either the whole overcharge or a part thereof to the plaintiff and other consumers. The numerous steps between the defendant's conduct and the plaintiff's injury "alone is strongly suggestive of remoteness." *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 355.

Turning to the second factor of the analysis, we must determine whether recognizing the claims of the indirectly injured would lead to apportionment problems and the risk of multiple recoveries under the circumstances of the present case. To allow the plaintiff to recover for his injuries under the circumstances of the present case inevitably would lead us into a quagmire whereby we would be required "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries." (Internal quotation marks omitted.) Id., 353. These are the same concerns that the court in *Illinois Brick* identified in declining to allow indirect purchasers to recover damages under § 4 of the Clayton Act. See *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 737–38. As we discussed in part I of this opinion, the direct purchaser rule had arisen, in part, out of a concern that allowing indirect purchasers to recover "would transform treble-dam-

ages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers." Id., 737. Added to the difficulties of apportionment is the impossible task of measuring the damages of each indirect purchaser, from those closest to the direct purchaser to those, like the plaintiff, who are the ultimate purchasers of finished products. See id., 741–42 (discussing inherent problems of measuring impact of illegal overcharge at each level in chain of distribution). The second factor of our analysis counsels against such an approach.

The third factor in our analysis also counsels against allowing the plaintiff to recover damages for his injuries. Under this factor, we consider whether "there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 353. The plaintiff identifies at least two additional levels of parties, namely, original computer equipment manufacturers and retailers, whose injuries are more closely related to the defendant's conduct. There may be, however, additional layers of injured parties throughout the distribution chain not yet identified by the plaintiff. We conclude, therefore, that the plaintiff's injuries are too remote in relation to the defendant's conduct, and, consequently, the plaintiff lacks standing to assert a CUTPA claim against the defendant on the basis of the defendant's allegedly anticompetitive conduct. See id., 346–47 (remoteness of injury implicates party's standing and, in turn, court's subject matter jurisdiction). Thus, the trial court properly granted the defendant's motion to strike counts two and three of the plaintiff's complaint alleging the defendant's violations of CUTPA.

The judgment is affirmed.

In this opinion the other justices concurred.