[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO STRIKE
In this case, plaintiffs Bennett Restructuring Fund, L.P.[1] and Bennett Offshore Restructuring Fund, Inc. (collectively, Bennett Funds")[2] have sued the defendants — several former officers and directors of Renaissance Cosmetics, Inc. ("RCI"), a manufacturer and marketer of fragrances, artificial nail care products and lip and eye makeup[3] — to recover damages for losses they claim to have suffered due to misrepresentations and material omissions by the defendants, in documents they signed and filed with the Securities and Exchange Commission ("SEC") in 1997 and 1998, as to the true financial health of Rd. According to the plaintiffs' five-count Revised Amended Complaint ("Complaint") dated November 28, 2001, the defendants made their misrepresentations and material omissions in RCI's 1997 and 1998 10-Ks, where they knowingly, recklessly or negligently informed the SEC, and thus potential investors in RCI, that RCI had tens of millions of dollars worth of assets and revenues that did not exist when RCI was actually insolvent or "in the vicinity of insolvency." The plaintiffs claim that they relied on those misleading documents when they purchased certain RCI notes — 11 3/4 Senior Notes Due 2004 ("the Notes") with an aggregate face value of over $36 million — at artificially inflated prices in 1998. Insisting that they would not have purchased the Notes, or would not have purchased them at such high prices, had they known of RCL's true financial situation at the time, the plaintiffs claim that the defendants are liable to them for the total loss of their investment in the Notes, which occurred one year later, in the summer of 1999, when RCI filed for bankruptcy and was unable to repay the Notes. The plaintiffs seek damages from the defendants on theories of fraud (Count One), negligent misrepresentation (Count Two), negligence (Count Three), breach of the affirmative duty of full and honest disclosure (Count Four), and breach of fiduciary duty (Count Five).[4]
The case is now before the Court on the defendants' three pending CT Page 436 motions to strike.[5]
 I. FACTS
The following facts are pleaded in the plaintiffs' Complaint:
A. The Defendants
RCI was formed in 1994 by Kidd, Kamm Company ("KKC"), a company founded by defendants Kamm and Kidd in 1987. Complaint, ¶¶ 10-11. Beginning in August 1994, RCI paid fees to KKC pursuant to a Management Agreement. Id., ¶ 10. Principals of KKC also organized Kidd Kamm Equity Partners, L.P. ("KKEP"), which invested over $20 million in RCI and owned 73.4% of RCI's common stock during the time frame here at issue. Id.
Defendant Hamburg was elected a director of RCI in October 1994 and served in that position until January 30, 1998. Throughout that period, Hamburg was a partner in KKC and an affiliate of KKEP as well as an active participant in the management and operation of RCI. Id.
Defendants Kidd, Kamm and Theodore were also partners in KKC and affiliates of KKEP while serving as directors of RCI and participating actively in the management and operation of RCI. Id. Kidd and Theodore were elected directors in May 1994, and Kamm was elected a director in October 1994. Id., ¶¶ 11, 13-14. All three served as RCI directors until June or July 1999, with Kidd serving on RCI's Audit Committee from March 31, 1995 to March 31, 1998 and Theodore also serving both on the Audit Committee, from March 31, 1997 to March 31, 1998, and as Chairman of the Board of Directors beginning in September 1997. Id.
Defendant Kaung joined RCI in July 1995 as Group Vice President and Chief Financial Officer ("CFO"). Kaung remained the CFO of RCI — a capacity in which he was responsible for ensuring the accuracy of all of RCI's financial statements — until October 1, 1997. Id., ¶ 12. At certain times relevant to this case, Kaung was a shareholder of RCI.Id.
Defendant Becker was appointed Chief Executive Officer ("CEO") and a director of RCI effective May 28, 1997. He remained in those positions until September or October 1998, and served on RCI's Audit Committee during the 1997 and 1998 Fiscal Years. Id., ¶ 16.
Defendant Corso was a director and the CFO of RCI between October 1997 and September or October 1998. Like his predecessor, defendant Kaung, CT Page 437 Corso was responsible for ensuring the accuracy of all of RCI's financial statements. Id., ¶ 15.
Finally, defendant Greene was a director of RCI and its President of Sales as of March 1998. Id., ¶ 17. Greene owned 1% of RCI's common stock.
B. The Notes
By way of an Offering Memorandum dated February 3, 1997, the Notes were offered for sale through a private placement; therefore, at the time, the Notes were not freely transferable. On March 24, 1997, RCI filed a Registration Statement on Form S-4, effective May 8, 1997, in order to perform an exchange offer, making the Notes freely transferable. As a result of the exchange offer, which was completed on June 8, 1997, the Notes were traded on the secondary market for the first time in June 1997. KKC received $1.35 million in fees upon the closing on the offering of the Notes.
The following chart reflects the dates on which the Notes were purchased by the plaintiffs:
 Purchaser Date Face Value of Purchase Price Notes
 BRF March 24, 1998 $6,667,000 53.15 BORF March 24, 1998 $3,333,000 53.13 BRF August 17, 1998 $330,000 12.26 BORF August 17, 1998 $170,000 12.27 BRF August 19, 1998 $6,665,000 10.25 BORF August 19, 1998 $3,335,000 10.25 BRF August 20, 1998 $10,000,000 10.25 BORF August 20, 1998 $5,000,000 10.25 BRF August 20, 1998 $525,000 10.5 BORF August 20, 1998 $260,000 10.5
Id., ¶ 22.
 C. The Defendants' Alleged Misstatements Concerning RCI's Financial Condition and the Plaintiffs' Alleged Reliance On Them
 1. The 1997 10-K
The defendants' alleged misstatements concerning RCI's financial condition were contained in RCI's financial statements and public CT Page 438 filings. Id., ¶ 25. The first such document cited by the plaintiffs is RCI's annual report for Fiscal Year 1997, ending March 31, 1997, which was filed with the SEC on Form 10-K ("the 1997 10-K") on or about June 30, 1997. Id., ¶ 26. The 1997 10-K, which was signed by defendants Becker, Kaung, Hamburg, Kamm, Kidd and Theodore, included the following information about RCI's operations in Fiscal Years 1996 and 1997:
1997 1996
Total Current Assets: $135,736,000 $72,940,000
Intangible Assets (net): $174,177,000 $76,895,000
Total Assets: $361,383,000 $184,619,000
Total Liabilities: $269,737,000 $166,470,000
Net Sales: $174,612,000 $131,286,000
Cost of Goods Sold: $69,723,000 $51,317,000
Net Loss ($41,818,000) ($12,057,000)
Id., ¶¶ 26-27.
In addition to the foregoing figures, which clearly painted a picture of increasing growth and profitability for RCI in 1996 and 1997, the 1997 10-K represented as follows that RCI's long-lived assets, including goodwill, were not impaired:
 The Company's long-lived assets consist of property, plant and equipment and intangible assets, including goodwill. The Company evaluates whether there has been a permanent impairment of any of its long-lived assets. An impairment in value will be considered to have occurred when it is determined that the undiscounted future operating cash flows generated by the operating unit are not sufficient to recover the carrying value of such long-lived [assets]. If it has been determined that an impairment in value has occurred the long-lived assets would be written down to an amount equivalent to the present value of the future operating cash flows being generated by the operating unit. Adoption of SFAS 121 ["Accounting for impairment of Long Lived Assets and for Long Lived Assets to be Disposed of"] CT Page 439 did not have a material effect on the Company's financial position and results of operations.
Id., ¶ 28.
The 1997 10-K also contained a glowing description of RCI's category management system, which reportedly provided RCI's management with weekly, real-time reports on recent sales of products based on information received directly from retailers' cash registers. RCI's management reportedly received this information from Information Resources, Inc. ("IRI"), an independent market research firm that collected the data through its InfoScan service.
According to the 1997 10-K, the category management system gave RCI a material advantage over its competition in the following way:
 Management believes that the Company is the category captain for eight of its ten top nail care accounts and is category captain or advisor for most of its major fragrance accounts. . . . The Company commits significant funds each year to Information Resources Inc. ("IRI") to track weekly sales data on all products it sells through mass market channels.
 Category management allows the company to work with retailers to . . . (iii) monitor the sales results, both for the Company's products and its competitors' products on a weekly basis . . . The Company's category management program also enables the Company's marketing department to perform a variety of functions, including: (a) real time understanding of relaunch marketing effectiveness.; (b) gauging new product success rates for the Company's products and its competitors' products; and (c) amassing competitive intelligence about consumer buying patterns.
Id., ¶ 30. The "real-time" reporting aspect of category management reportedly enabled RCI's management to know within a matter of days whether products were being purchased by consumers or were experiencing marketing difficulties. Id., ¶ 31. Such timely information assertedly allowed management to adjust marketing strategies promptly to maximize sales, develop marketable products, and assist retailers daily in developing optimal shelf space in order to maximize profitability. Id.
CT Page 440
The 1997 10-K also reported that RCI's own Management Information Systems (MIS) allowed it to track sales and inventory as follows:
 The new MIS platform . . . allows the Company to . . . (iii) enable sales force and accounts receivable managers to process and track orders and returns, (iv) provide sophisticated inventory management and track distribution capabilities and (v) install corporate-wide measurement systems which yield accurate and timely information regarding sales, costs, profits, accounting functions, customer service and asset management.
Id., ¶ 32.
The plaintiffs claim that they reasonably relied upon the foregoing representations regarding the effectiveness of RCI's category management system and MIS when they decided to invest in the Notes. They assert, more particularly, that the existence and effective functioning of those systems, as reported in the 1997 10-K, made them believe in the accuracy of the financial data set forth in that document, for such data were impliedly based upon accurate, updated information about RCI's sales, returns and inventory despite RCI's practice of recognizing revenue from sales at the time it made sales to retailers even though such sales were subject to a right of return. RCI allegedly compensated for this uncertainty by setting aside a reserve against sales based upon historical experience. Id., ¶ 33.
Finally, the 1997 10-K made the following representations as to RCI's treatment of intangible assets related to its recent purchases of several fragrances and cosmetics companies:
 Goodwill, which represents the excess of the cost of purchased businesses over the fair value of their net assets at date of their acquisition, is being amortized on a straight-line basis, over various periods ranging from 5 to 25 years.
Id., ¶ 35.
The plaintiffs claim that they relied on all of the foregoing representations as to RCI's financial condition when they decided to invest in the Notes. Id., ¶ 36. They assert that they would not have purchased the Notes, or would not have purchased them for the prices they paid, had they known that such information was inaccurate. Id., ¶ 37. CT Page 441
In fact, claim the plaintiffs, the financial information presented by the defendants in the 1997 10-K was materially misleading in several respects. Id., ¶ 38. To begin with, the 1997 10-K failed to report that RCI had experienced materially disappointing sales in the 1996 Christmas season, which had resulted in the return of 50% or more of the products launched in that period, although the reserves for such returns were materially understated. Thus, the revenues reported in that document were allegedly overstated by tens of millions of dollars, and the values of RCI's inventory and accounts receivable were materially overstated as well. Id., ¶ 39.
The defendants who signed the 1997 10-K allegedly knew, or recklessly or negligently failed to know, about RCI's disappointing sales and high levels of returns because: (1) such information was readily available to RCI, and thus to the defendants, through IRI and InfoScan, MIS and/or captains in the field; (2) all returns of year-end holiday merchandise for full credit against retailers' account balances were made by the end of March 1997, the end of its Fiscal Year, by an authorization procedure that gave RCI current information about the true rate of returns long before the 1997 10-K was filed with the SEC,; and (3) all accounts receivable for year-end holiday sales which RCI had on its books were due and owing by the end of the Fiscal Year as well, and thus could have been adjusted to reflect the high rate of product returns. Id., ¶¶ 40-43. Therefore, claim the plaintiffs, the defendants knew or should have known of their actual returns before they filed the 1997 10-K, and should have reported reduced sales, inventory figures and accounts receivable to reflect them instead of the overstated figures they did report.
The plaintiffs also claim that RCI materially misstated its assets based on the acquisition of other companies which RCI knew or should have known to be experiencing difficulties, particularly poor sales and diminished operating cash flows, and that the operations of these acquired companies were not being integrated into RCI's operations to obtain the disclosed value, efficiencies aor synergies expected from "rolling up" such acquisitions. Id., ¶ 44. RCI disclosed $174.1 million of net intangible assets in the 1997 10-K despite an actual appraisal of those assets, in early 1997, of between $117 million and $127 million. Id.
The 1997 10-K also allegedly failed to disclose the negative trends, uncertainties, changes in financial condition and results of operations regarding the integration of acquisitions and related business difficulties. The defendants did not disclose this information in any other public statement or filing during the remainder of 1997. Instead, CT Page 442 despite their knowledge of these difficulties, they presented the picture of a healthy company in the 1997 10-K. Id., ¶¶ 45-46.
 2. The 1998 10-K
The second document in which the defendants allegedly made material misrepresentations as to the financial condition of RCI was RCI's annual report for Fiscal Year 1998 ("the 1998 10-K"), which was filed with the SEC on Form 10-K on or about July 1, 1998. This document, which was signed by defendants Becker, Corso, Theodore, Kamm, Kidd and Greene, and filed with the SEC on or about July 1, 1998, publicly disclosed for the first time that RCI had been experiencing materially adverse sales of its products for the past two years and that there had been materially adverse difficulties with its acquisitions and business strategy. Id., ¶ 48. Accordingly, it provided for large write-downs, consisting of $85 million for impairment of assets, $23 million as an increase of reserves against sales, and an additional $35 million as a result of restructuring costs.
As for sales in particular, the 1998 10-K reported disappointing Christmas sales in Fiscal Years 1997 and 1998, disappointing sales in other parts of calendar years 1996, 1997 and 1998, and far greater returns of products than had reported in the 1997 10-K. As a result, RCI made substantial downward adjustments in its net sales figures for three of its divisions for Fiscal Year 1997, to wit: a decrease of $12.1 million for its Fragrance Division; Id., ¶ 52; a decrease of $5.3 million for its Cosmetics Division; Id., ¶ 53; and a decrease of $1.4 million for its International Division. Id., ¶ 54.
The 1998 10-K also revealed that RCI's costs and expenses had been understated in the 1997 10-K, by $2.2 million and $2.0 million, respectively. Id., ¶ 55.
In light of the foregoing adjustments to income, costs and expenses, all of which were assertedly based on information that was readily available to the defendants when they signed and filed the 1997 10-K, RCI's operating profit for Fiscal Year 1997 was actually an $18.5 million loss instead of a $4.5 million gain, as reported in the 1997 10-K, and its Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) were actually negative $3.8 million instead of the positive $19.2 million reported in the 1997 10-K. Such substantially reduced figures, and the large write-downs taken to account for them, allegedly revealed that RCI was insolvent or in the vicinity of insolvency as early as March 1997. Id., ¶ 59. Accordingly, the plaintiffs allege that the defendants owed a fiduciary duty to disclose that information to RCI's creditors beginning in or around March 1997, and the duty continued CT Page 443 throughout the time that the plaintiffs became creditors of RCI. Id. The defendants allegedly breached this duty by publishing the misleading 1997 10-K. Id.
Despite its revelations as to RCI's financial difficulties, the plaintiffs contend that the 1998 10-K was itself misleading in several respects. First, the plaintiffs claim that it was misleading in its suggestion that the $85 million in write-downs RCI had belatedly taken were sufficient to account for all previous overstatements of its sales and its assets. In fact, claim the plaintiffs, the write-downs were insufficient, as sales and assets were still overstated in the 1998 10-K. Id., ¶ 75.
Sales figures reported in the 1998 10-K were allegedly inaccurate because they continued to include revenue recognized from the "sale" of large numbers of products to retailers, even though the retailers had the right to return the products for a full refund if they could not be sold. The defendants allegedly knew, or recklessly or negligently failed to know, of these inaccuracies, because current sales and product return data were readily available to them through IRI and MIS.
Assets figures reported in the 1998 10-K were likewise inaccurate in two significant ways. First, they were allegedly inaccurate as to the value of RCI's inventory. Though the inventory was said to have a value of $55 million in the 1998 10-K, the plaintiffs claim that it in fact was virtually worthless because it consisted almost entirely of returned products that were either out-of-season or otherwise unsalable or obsolete. Id., ¶ 84. Second, the 1998 10-K was allegedly inaccurate as to the value of RCI's receivables. Though the 1998 10-K reported that RCI had almost $33 million in receivables, the plaintiffs claim that it actually had none, as evidenced by its declaration of bankruptcy in June 1999. Id., ¶ 83.
The plaintiffs also claim that the 1998 10-K was misleading because it failed to disclose facts known to the defendants as to RCI's difficulties with reconciliations, failure to perform an adequate analysis to support the adequacy of its reserves for its returned merchandise, difficulty managing its inventory, significant problems with its MIS system, and overall lack of historical experience on which to justify recognizing revenue from sales made with a right of return. Id., ¶¶ 88-91. All of these problems, claim the plaintiffs, were brought to the defendants' attention by RCI's independent auditors from Deloitte Touche, LLP on or about June 27, 1997 — three days before the 1997 10-K was filed and over one year before the 1998 10-K was filed with the SEC.Id., ¶ 91. The plaintiffs claim that in light of the magnitude of the CT Page 444 problems discovered by the auditors, the defendants had a duty to disclose those problems to existing and potential creditors of RCI in the 1997 and 1998 10-Ks, or to cause the disclosures made in those documents to be corrected, withdrawn or restated, which the defendants failed to do. The plaintiffs assert that the defendants were motivated not to make such damaging disclosures by their selfish interest in retaining their positions at RCI, in realizing incentive bonuses made available to them by RCI,[6] in protecting themselves from potential liability, and in creating and maintaining an artificially high price for RCI's publicly-traded securities, including RCI stock, which many of them owned. Id., ¶ 93.
 II. THE PLAINTIFFS' CLAIMS AND THE DEFENDANTS' CHALLENGES TO THEM A. The Claims
In the First Count of their Complaint, the plaintiffs seek compensatory and punitive damages from the defendants for alleged fraud in connection with the defendants' preparation and public filing of RCI's 1997 and 1998 10-K's. The plaintiffs claim that by submitting those documents to the SEC, either with knowledge that they contained material misrepresentations and omitted material information as to the true financial health of RCI, or with reckless disregard for the truth or falsity of their representations on that subject, the defendants intended to mislead them to invest in RCI, and/or to maintain or increase their RCI investments, for the defendants' personal gain. The plaintiffs claim that they justifiably relied on the defendants' misrepresentations and omissions in the 1997 and 1998 10-Ks when they decided to purchase the Notes, and that they were thereby caused to lose their entire investment when RCI filed for bankruptcy the following year and could not pay off the Notes.
In the Second Count of the Complaint, which is based on the same factual allegations that underlie the First Count, the plaintiffs seek compensatory damages from the defendants for alleged negligent misrepresentation. In this Count, the plaintiffs claim that the defendants made false statements as to the financial health of RCI in RCI's 1997 and 1998 10-Ks when they either knew or should have known, in the exercise of reasonable care, and were negligent in not knowing, that such statements were false when made. The plaintiffs claim that the defendants' conduct in making those false statements fell below the standard of ordinary reasonable care which they allegedly owed to the plaintiffs to issue financial statements and make public filings that were free of false statements and misrepresentations. This, claim the CT Page 445 plaintiffs, was particularly so since the defendants knew or should have known that investors such as the plaintiffs would rely on financial information in the 1997 and 1998 10-Ks in deciding whether or not to purchase the Notes, in determining whether or not to sell the Notes, and in determining whether or not to call a default on the Notes. The plaintiffs claim, as previously noted, that they would not have purchased the Notes, or would not have done so at the prices they paid for them, had they not been misled by the defendants and known instead the true facts about RCI, which the defendants negligently failed to disclose to them.
In the Third Count of the Complaint, the plaintiffs seek compensatory damages from the defendants for alleged negligence in connection with the same course of conduct which underlies the first two counts of the Complaint. Apart from its title, there are only two differences between the negligence claim made in the Third Count and the negligent misrepresentation claim made in the Second Count. First, the Third Count expressly asserts that the defendants' alleged duty to the plaintiffs to insure that RCI's 1997 and 1998 10-Ks were free of material misrepresentations and not misleading due to the omission of material facts arises from their positions as officers and/or directors of RCI. Second, unlike the Second Count, the Third Count makes no claim that the defendants supplied false information in the 1997 and 1998 10-Ks with knowledge or awareness that those documents would be used and relied upon by the plaintiffs and other investors in purchasing the Notes, determining whether or not to sell the Notes, and/or determining whether or not to call a default on the notes.
In the Fourth Count of the Complaint, the plaintiffs seek compensatory damages from the defendants for alleged breach of "the affirmative duty of full and honest disclosure" in connection with the preparation of RCI's public filings and the financial information contained in them. The defendants allegedly breached that affirmative duty by making material misrepresentations and omitting material facts needed to render other statements not misleading in RCI's 1997 and 1998 10-Ks. By virtue of their positions as officers and/or directors of RCI, the defendants allegedly were in a position to know and knew or should have known that their challenged statements were false when made. The plaintiffs claim that the defendants supplied the false information even though they knew that the 1997 and 1998 10-Ks were to be used and relied on by the plaintiffs and other investors in determining whether or not to purchase the Notes, whether or not to sell the Notes, and whether or not to call a default on the Notes. The plaintiffs claim that the defendants' breach of duty caused them to suffer damage by misleading them to purchase the Notes, which had no value, when they would not otherwise have done so, or CT Page 446 would not have done so at the prices they paid.
In the Fifth Count of the Complaint, the plaintiffs seek compensatory and punitive damages from the defendants for alleged breach of fiduciary duty. The plaintiffs claim that as officers and/or directors of RCI, the defendants owed a fiduciary duty to RCI's creditors, including the plaintiffs, from March 1997 onward, because in that time frame RCI was insolvent or in the vicinity of insolvency. As fiduciaries, claim the plaintiffs, the defendants were bound to act for the benefit of RCI's creditors and were prohibited from acting in their own self interest to the detriment of creditors. The plaintiffs claim that the defendants breached their fiduciary duty by making material misrepresentations and omitting to state material information concerning RCI's financial condition in RCI's 1997 and 1998 10-Ks, thus making RCI appear to be financially healthy when in fact it was not, and thereby artificially inflating the price of RCI's publicly traded securities, including the Notes, to the plaintiffs' financial detriment.
 B. The Motions to Strike
On January 2, 2002, defendants Hamburg, Kamm, Kidd and Theodore ("the Hamburg defendants") filed a Motion to Strike ("the Hamburg Motion") all five counts of the plaintiffs' Complaint for alleged failure to state claims upon which relief can be granted. With one exception, the claims advanced in the Hamburg Motion apply to all of the Hamburg defendants. Those common claims are as follows: (1) that, as individual holders of the Notes, the plaintiffs are barred by the Indenture — which is the contract that governs the Notes — from bringing any claims "with respect to . . . the Notes[,]" including all portions of the plaintiffs' first three claims (fraud, negligent misrepresentation and negligence) that are based on alleged misleading by the defendants that caused them to hold the Notes and not to call a default, and both of their last two claims (breach of the affirmative duty of full and honest disclosure and breach of fiduciary duty) in their entirety; (2) that all portions of the plaintiffs' claims which are based on the March Purchases of the Notes must fail because the statute of limitations has run with respect to those claims; (3) that all portions of the plaintiffs' claims which are based on the March Purchases must also fail because the plaintiffs could not justifiably have relied on the 1997 10-K when more recent information in RCI's February 1998 10-Q was already available; (4) that the plaintiffs' first three claims (fraud, negligent misrepresentation and negligence) must fail in their entirety because they do not allege that the defendants intended the plaintiffs to rely on RCI's financial disclosures; (5) that those portions of the plaintiffs' first three claims (fraud, negligent misrepresentation and negligence) CT Page 447 which are based on alleged misrepresentations in the 1998 10-K must fail because the plaintiffs have not alleged that anything in that document was incorrect, much less that the defendants knew it to be fraudulent when it was released; (6) that the plaintiffs' second and third claims (negligent misrepresentation and negligence) must fail in their entirety because they fail to allege that the defendants acted in bad faith when they relied on reports from their own outside experts, who allegedly certified RCI's financial reports; (7) that the plaintiffs' third and fourth claims (negligence and breach of the affirmative duty of full and honest disclosure) must fail in their entirety because Connecticut does not recognize those torts in this context; (8) that the plaintiff's fifth claim (breach of fiduciary duty) must fail in its entirety because the only fiduciary duty that directors owe to creditors when their company is in the zone of insolvency is to maximize the assets of the corporation, and any claim for breach of that duty is a derivative claim that belongs only to the corporation itself; and (9) that even derivative claims are presently unavailable to the company because it is currently in bankruptcy, and thus any such claim can only be asserted by its bankruptcy trustee. In addition to these common claims, the Hamburg defendants challenge the legal sufficiency of those portions of all claims brought against defendant Hamburg on the basis of the August Purchases because the plaintiffs do not allege that Hamburg signed the 1998 10-K. The Hamburg defendants have supported their Motion with two memoranda of law.
Also on January 2, 2001, defendant Kaung filed a separate Motion to Strike ("the Kaung Motion"), in which he adopted all the common arguments advanced by the Hamburg defendants and made several additional challenges to all five counts applicable only to himself. He has supported his Motion with a memorandum of law.
Finally, on January 4, 2002, defendants Becker and Corso filed their own separate Motion to Strike ("the Becker-Corso Motion"), which reasserted all the common claims raised by the Hamburg defendants and defendant Kaung, and asserted two additional reasons why certain counts of the Complaint should be stricken with respect to them, to wit: (1) that the plaintiffs' fraud claim against them should be stricken because the Complaint does not allege that they had any motive to commit fraud; and (2) that the plaintiffs' negligent misrepresentation claim against them should be stricken because the Complaint does not alleges facts tending to establish that they had any duty to the plaintiffs, or any knowledge that the plaintiffs had purchased the Notes. Becker and Corso have supported their Motion with a memorandum of law.
 III. THE STANDARD
CT Page 448
"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any [complaint] . . . to state a claim upon which relief can be granted. . . ." Peter-Michael, Inc. v. Sea ShellAssociates, 244 Conn. 269, 270-71, 709 A.2d 558 (1998). In deciding a motion to strike, the Court takes "the facts to be those alleged in the complaint . . . and [construes] the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the — motion to strike must be denied." Vacco v. Microsoft Corp., 260 Conn. 59,65, 793 A.2d 1048 (2002) (Citations omitted.)
"It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citations omitted.) Gazo v. Stamford, 255 Conn. 245, 260, 765 A.2d 505 (2001).
Consistent with this rule, the Court's construction of a challenged pleading must not be broad as to be unrealistic. Thus, the rule does not permit the saving of a challenged pleading by distorting its allegations to include unpleaded facts and theories of liability that are not fairly provable thereunder. Instead, it is well established that "[i]n deciding upon a motion to strike . . . [the Court] cannot be aided by the assumption of any facts not therein alleged." Liliedahi Brothers, Inc.v. Grigsby, 215 Conn. 345, 348, 576 A.2d 149 (1990) (Citations omitted; internal quotation marks omitted.) The Court is strictly "limited . . . to a consideration of the facts alleged in the complaint. A "speaking' motion to strike (one imparting facts outside the pleadings) will not be granted." Doe v. Marselle, 38 Conn. App. 360, 364, 660 A.2d 871 (1995).
 IV. ANALYSIS A. Challenges To Portions of Claims Presented In Particular Counts
Several of the defendants' pending challenges to particular counts of the plaintiffs' Complaint are directed only to portions of the claims presented in those counts. The challenges in question include the defendants' common claims: (1) that, as individual holders of the Notes, the plaintiffs are barred by the Indenture from bringing any claims "with respect to . . . the Notes," including those portions of the plaintiffs' fraud, negligent misrepresentation and negligence claims that are based on alleged misleading by the defendants that caused the plaintiffs to hold the Notes and not to call a default; (2) that all CT Page 449 portions of the plaintiffs' claims that are based on the March Purchases of the Notes must fail because the statute of limitations has allegedly run with respect to those claims; (3) that all portions of the plaintiffs' claims which are based on the March Purchases must fail because the plaintiffs could not justifiably have relied on the 1997 10-K when more recent information in RCI's February 1998 10-Q was already available; and (4) that those portions of the plaintiffs' fraud, negligent misrepresentation and negligence claims which are based on alleged misrepresentations in the 1998 10-K must fail because the plaintiffs have not alleged that anything in that document was incorrect, much less that the defendants knew it to be fraudulent when it was released.
Consistent with our longstanding rule that a motion to strike must be denied if any facts provable under a challenged count would support a valid claim or cause of action, a surgical motion to strike only one of two or more alternative bases for establishing a claim or cause of action must be rejected. The only circumstance in which a motion to strike may properly be used to challenge one or more paragraphs in a single count is if those paragraphs purport to state a separate and distinct cause of action. See, e.g., MVD Custom Design Construction, LLC v. Jones,
Superior court, judicial district of Stamford, Docket No. 183779 (January 29, 2002, Lewis, J.). See also Coston v. Reardon; Superior Court, judicial district of Windham, Docket No. 063892 (October 18, 2001,Foley, J.); Pete's Plumbing v. Meade,Superior Court, judicial district of Danbury, Docket No. 340790 (April 12, 2001, Adams, J.). Here, because none of the defendants' above-described challenges is addressed to a portion of a challenged count that purports to state a separate and distinct cause of action, each such challenge must be rejected as procedurally improper.
B. Challenges To Particular Counts or Portions Thereof Based On FactsNot Pleaded Therein
Many of the defendants' challenges to particular counts of the Complaint or portions thereof must be rejected on the separate procedural ground that they are based upon facts not pleaded in the Complaint. Such challenges, to reiterate, are procedurally deficient because the Court is bound, on a motion to strike, to take "the facts to be those alleged in the complaint." Vacco v. Microsoft Corp., supra, 260 Conn. at 65. Thus, "[i]n deciding upon a motion to strike . . . [the Court] cannot be aided by the assumption of any facts not therein alleged." (Citations omitted; internal quotation marks omitted.) LiViedahl Brothers, Inc. v. Griasby,supra, 215 Conn. at 348. The Court is "limited . . . to a consideration of the facts alleged in the complaint. A `speaking' motion to strike (one CT Page 450 imparting facts outside the pleadings) will not be granted." Doe v.Marselle, 38 Conn. App. 360, 364, 660 A.2d 871 (1995)
The first set of challenges that must be rejected on this basis are those which rely on language in the Indenture — the contract under which the Notes were issued, which assertedly bars the plaintiffs, as individual holders of the Notes, from bringing any claims "with respect to . . . the Notes." Such challenges are directed both to those portions of the plaintiffs' fraud, negligent misrepresentation and negligence claims which are based on alleged misleading by the defendants that allegedly caused them to hold the Notes and not to call a default and to the plaintiffs' breach-of-affirmative-duty and breach-of-fiduciary-duty claims in their entirety. All such challenges must be rejected for the simple reason that the Indenture is not even referenced or described in the Complaint, much less appended thereto or incorporated therein. Accordingly, it cannot be relied on as a basis for striking any of the plaintiffs' pending claims.
A second set of challenges that must be rejected on this basis are those that contest portions of the plaintiffs' claims which are based on the March Purchases. The challenges in question are based on the claim that the plaintiffs could not justifiably have relied on the 1997 10-K when making the March Purchases because by then, more recent information in RCI's February 1998 10-Q was already available to them. The fatal flaw with these challenges is that the document on which they are based — RCI's February 1998 10-Q — is not mentioned nor described, generally or specifically, anywhere in the Complaint. Therefore, such challenges, like those based on the language of the Indenture, cannot be adjudicated on a motion to strike.
A third set of challenges that this Court cannot consider on a motion to strike are those directed to the plaintiffs' claims of negligent misrepresentation and negligence on the ground that such claims are deficient for failure to allege that the defendants acted in bad faith when they relied on reports from their own outside experts, who allegedly certified RCI's financial reports. Those challenges are procedurally improper because they are based on two key facts that are not pleaded in the Complaint: (1) that the defendants actually relied on reports from their own outside experts when they made the alleged misrepresentations here at issue; and (2) that such outside experts certified RCI's financial reports. Any challenge based upon such unpleaded facts can only be adjudicated on a motion for summary judgment or at trial.
A fourth and final challenge by these defendants that cannot be adjudicated on a motion to strike is their claim that the plaintiffs lack CT Page 451 standing to claim breach of fiduciary duty because that claim now belongs to and can only be asserted by RCI's bankruptcy trustee. Though the Complaint expressly pleads that RCI filed for bankruptcy in 1999, and that its assets were sold thereafter for approximately $29 million, the current status of the bankruptcy proceeding, and of the plaintiffs' breach-of-fiduciary-duty claim as part thereof, cannot be determined without considering extrinsic evidence. Accordingly, this aspect of the defendants' challenge to the Complaint must also be rejected without prejudice to its reassertion by a different procedural vehicle.
 C. Challenges To Plaintiffs' Claim of Fraud For Alleged Failure To Properly Plead That The Defendants Intended To Induce The Plaintiffs To Rely On Their Alleged Misstatements in RCI's Financial Disclosures
The defendants assert that the plaintiffs' claim of fraud, as pleaded in the First Count of the Complaint, must be stricken because it fails to state sufficient facts to support the plaintiffs' core allegation that the "[d]efendants intended for them to rely upon the material misrepresentations and omissions made in the 1997 and 1998 10-Ks." Complaint, Count I, ¶ 98. The defendants argue, in particular, that only two paragraphs in the Complaint plead facts from which the defendants' intent to induce reliance might be inferred, but that the facts therein stated are insufficient for that purpose as a matter of law.
The paragraphs in question are ¶¶ 24 and 79, which are incorporated into each count of the Complaint. In ¶ 24, the plaintiffs claim that when the defendants made their alleged misstatements in the 1997 and 1998 10-Ks, they were aware that the exchange offer had been made and that public trading of the Notes had commenced. On that basis, the plaintiffs contend that the defendants "knew or should have known that purchasers of the Notes such as Plaintiffs would rely upon their misstatements in purchasing the Notes." In ¶ 79, the plaintiffs further allege that when the defendants made their alleged misstatements in the 1998 10-K — the same document in which they first disclosed that RCI could not make interest payments on the Notes — they "knew or should have known that trading on the Notes would increase, and that purchasers of the Notes such as Plaintiffs would rely upon the 1998 10-K in deciding whether to purchase the Notes."
The defendants assert that the foregoing allegations are insufficient to establish intent to induce reliance for two basic reasons: first, they plead only actual or constructive knowledge by the defendants of the secondary market for RCI's Notes rather than intent to induce the CT Page 452 plaintiffs to purchase the Notes; and second, they fail to allege that the defendants communicated with the plaintiffs about their purchases or had any other involvement with those purchases at all. For the following reasons, the Court concludes that the plaintiffs' challenged allegations are legally sufficient to support their claim of fraud.
"The essential elements of an action in common law fraud are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury." (Citations omitted.) SuffieldDevelopment Association, L.P. v. National Loan Inv., 64 Conn. App. 192,202, 779 A.2d 822 (2001). See also Barbara Weisman, Trustee v. Kaspar,233 Conn. 531, 539, 661 A.2d 530 (1995). "All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery." (Internal quotation marks omitted.) Citino v. RedevelopmentAgency, 51 Conn. App. 262, 275, 727 A.2d 1197 (1998). "Fraud is not to be presumed, but must be strictly proven. The evidence must be clear, precise and unequivocal." Connell v. Colwell, 214 Conn. 242, 252, 571 A.2d 116
(1990). "Because the standard of proof at trial is heightened, so too is the standard for pleading a cause of action [for fraud]." St. Denis v. deToledo, Superior Court, judicial district of Stamford-Norwalk, Docket No. 180606 (April 5, 2002, Downey, J.)
"Where a claim for damages is based upon fraud, the mere allegation that a fraud has been perpetrated is insufficient; the specific acts relied upon must be set forth in the complaint." Maruca v. Phillips,139 Conn. 79, 81, 90 A.2d 159 (1952). "As a threshold matter, a plaintiff alleging . . . intentional misrepresentation should allege the claimed false statements." Yacht Centers, LLC v. Harbor Plaza Association,
Superior Court, judicial district of Stamford-Norwalk, Docket No. 143912 (March 28, 1996, Ryan, J.) "An actionable misrepresentation, whether made knowingly, recklessly, negligently or innocently, must be made for the purpose of inducing action upon it." J. Frederick Scholes Agency v.Mitchell, 191 Conn. 353, 359, 464 A.2d 795 (1983).
In the present case, the plaintiffs have expressly pleaded that the defendants made material misrepresentations and omissions in RCI's 1997 and 1998 10-Ks with the intent of inducing the plaintiffs to rely upon them. Complaint, Counts I-III, ¶ 98. The plaintiffs have described the defendants' alleged misstatements in great detail in the body of the Complaint. Id., ¶¶ 25-93. Each such misstatement was allegedly made with knowledge that it gave potential investors a false impression that RCI was in good financial health when in fact it was not. In addition, the Complaint sets forth many interrelated facts from which it might CT Page 453 fairly be inferred that the defendants made their alleged misstatements with the intent of inducing the plaintiffs and others like them to purchase the Notes. Such facts include: (1) that the defendants' knew that the Notes were being traded on the secondary market; id., ¶¶ 24, 79; (2) that the defendants were aware that prospective purchasers of the Notes would rely upon the 1997 and 1998 10-Ks in purchasing the Notes;id.; and (3) that, as owners, officers and directors of RCI, the defendants all had personal financial interests in the success of RCI, and thus motives for misrepresenting the facts about RCI's financial health in order to induce investors to purchase the Notes at artificially inflated prices. Id., ¶¶ 63-67.
To survive a motion to strike, a plaintiff need not prove the essential allegations of its challenged claim or cause of action. Instead, it must show that facts provable under those allegations would sufficient, if proved at trial, to establish the claim or cause of action. By that standard, the First Count of the plaintiffs' Complaint more than adequately pleads the essential element of intent to induce reliance upon the defendants' alleged misstatements in the 1997 and 1998 10-Ks. Not only is the requisite intent expressly alleged, but a logical basis for inferring that the defendants acted with that intent when they made their alleged misstatements is clearly and coherently set forth. Accordingly, the defendants' Motion to Strike with respect to the First Count must be denied.
 D. Challenges To Plaintiffs' Claim of Negligent Misrepresentation For Alleged Failure To Properly Plead That The Defendants Intended To Induce The Plaintiffs, Either Personally or As Members of A Limited Group of Persons For Whose Benefit The Defendants Supplied Business Information, To Rely Upon Their Alleged Misstatements in RCI's Financial Disclosures
The defendants advance two related reasons why the plaintiffs' parallel claim of negligent misrepresentation, as pleaded in the Second Count of the Complaint, must be stricken. First, they argue, as they did with respect to the First Count, that the facts pleaded in the Second Count are insufficient to support the plaintiffs' core allegation that the "[defendants intended for them to rely upon the material misrepresentations and omissions made in the 1997 and 1998 10-Ks." Complaint, Count I, ¶ 98. Second, they argue that even if the plaintiffs have adequately pleaded intent to induce reliance, the plaintiffs have no right to recover damages for losses resulting from such reliance because the plaintiffs were not persons for whose benefit and CT Page 454 guidance the defendants made the misrepresentations here at issue.
"[Our Supreme Court] has long recognized liability for negligent misrepresentation. [It has] held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know or has the duty of knowing the truth." (Internal quotation marks omitted.) Citino v. Redevelopment Agency, 51 Conn. App. 262, 273,721 A.2d 1197 (1998). "The governing principles," the Court has explained,
 are set forth . . . in § 552 of the Restatement (Second) of Torts (1977): "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575,657 A.2d 212 (1995).
In Subsection (2) of Section 552, the substantive scope of the foregoing rule is expressly limited as follows:
 Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The comments following Subsection (2) further provide as follows:
 [I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker intends to CT Page 455 reach and influence either a particular person or persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. . . . It is not enough that the maker knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
Restatement (Second), Torts, § 552, comment (h) (1976).
In the Second Count, the plaintiffs allege that the defendants supplied false or misleading information about the financial health of RCI in the 1997 and 1998 10-Ks, and that they reasonably relied upon such information when they purchased the Notes. The plaintiffs further allege that when the defendants made their alleged misstatements, they intended potential purchasers of the Notes including the plaintiffs to rely upon them because they then knew that the Notes were being publicly traded on the secondary market, they were aware that RCI's publicly filed documents would be the major source of information about RCI for such potential purchasers, and they had financial interests in RCI that gave them a motive to promote sales of the Notes. Construing these allegations in the manner most favorable to the plaintiffs, the Court concludes, as it did with respect to the plaintiffs' claim of fraud, that the plaintiffs have sufficiently pleaded the intent-to-induce-reliance element of their claim of negligent misrepresentation.
As for the defendants' challenge to the plaintiffs' personal right to make a claim of negligent misrepresentation in this context, a much closer question is presented for the Court's decision. The defendants rightly argue that the Second Count must be stricken if the plaintiffs have failed to allege facts tending to establish that the defendants made their alleged misrepresentations for the benefit and guidance of the plaintiffs personally, or that of some limited group of persons to which the plaintiffs belonged. Here, claim the defendants, the pleaded facts have no tendency to prove this essential element of negligent misrepresentation for the following reasons.
First, the plaintiffs have not pleaded that they purchased the Notes from the defendants, or even from RCI. To the contrary, they have alleged that they purchased the Notes on the secondary market more than one year after the Notes were issued by RCI. Second, the plaintiffs have not pleaded that any defendant ever communicated with them directly concerning the Notes, either orally or in writing. They therefore do not claim that CT Page 456 any defendant ever communicated with them directly about any matter that might have influenced their decision whether or not to purchase the Notes, including but not limited to the financial health of RCI. Third, the plaintiffs have not pleaded that the defendants had any relationship with the plaintiffs of any kind. They therefore do not claim that they had any expectation of receiving information or guidance from the defendants concerning their contemplated purchase of the Notes. In light of these omissions from the challenged Count, the defendants claim that the plaintiffs have failed to plead sufficient facts to establish that they were persons for whose benefit and guidance the defendants made the challenged misrepresentations. Instead, they argue, the pleaded facts show no more than that the plaintiffs were members of "the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." Restatement (Second), Torts, comment (2) to § 552. Because such persona have no right of action under § 552, the defendants insist that the plaintiffs' claim of negligent misrepresentation must be stricken.
The plaintiffs have responded to this argument in several ways. First, they contend that the only proper inquiry on this subject is whether or not it was reasonably foreseeable that they would rely upon the defendants' misrepresentations in RCI's 1997 and 1998 10-Ks in deciding to purchase the Notes. The plaintiffs claim that they have pleaded sufficient facts to establish such reasonable foreseeability, including: (1) that when the defendants made their alleged misstatements, they knew or should have known that such misstatements were false; (2) that the defendants knew at that time that public trading of the Notes had commenced; (3) that the defendants also knew at that time that their financial disclosures in the 1997 and 1998 10-Ks would be used and relied upon by potential RCI investors such as the plaintiffs in deciding whether or not to purchase the Notes; and (4) that the defendants intended that the 10-Ks would influence such potential investors to purchase the Notes. On this basis, the plaintiffs claim that the defendants should reasonably have anticipated that the plaintiffs would rely upon their misstatements and suffer harm of the same general type that they claim to have suffered when they purchased the Notes.
Second, the plaintiffs argue that there is no requirement that they have any special relationship with the defendants for the defendants to be liable to them for negligent misrepresentation. Williams Ford, Inc.v. Hartford Courant Co., supra, 232 Conn. at 567. It is enough, claim the plaintiffs, to plead and prove that their reliance upon the defendants' negligent misrepresentations was justifiable or reasonable facts they have alleged in their challenged pleading whose determination must be CT Page 457 made by the trier of fact based upon all of the circumstances proved at trial.
Third and finally, the plaintiffs argue that, as pleaded in their Complaint, the only persons for whose benefit and guidance the defendants prepared and filed RCI's 1997 and 1998 10-Ks were a limited group of persons, including the plaintiffs, who were contemplating investing in RCI's bonds. On that basis of that allegation, which must be liberally construed so as to sustain their claim of negligent misrepresentation, the plaintiffs assert that their claim of negligent misrepresentation must not be stricken, but instead must be allowed to proceed to trial.See D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,202 Conn. 206, 219-20, 520 A.2d 217 (1987).
Before addressing the merits of defendants' challenge, the Court adverts once again to the standard for deciding motions to strike: A plaintiff need not prove the essential allegations of its challenged claim or cause of action to survive a motion to strike. Instead, it need only demonstrate that facts provable under those allegations would be sufficient, if proved at trial, to establish the relevant claim or cause of action.
By that standard, the Court finds that the Second Count of the plaintiffs' Complaint is sufficient to survive the defendants' motions to strike because facts provable under that Count could establish that the plaintiffs were, as alleged, members of a limited group of persons — potential investors in RCI's Notes — for whose benefit and guidance the defendants prepared and filed the 10-Ks in which they made their alleged misrepresentations. The defendants have argued as a matter of fact that the 1997 and 1998 10-Ks were not prepared for the purpose of inducing potential RCI investors to purchase the Notes, but rather to satisfy annual reporting requirements imposed by federal law. They have also suggested that the group of potential investors in RCI's Notes is actually large and unlimited, not narrow and focused, as is required for the imposition of liability for negligent misrepresentation under Restatement § 552. These arguments, however, cannot be raised successfully on a motion to strike, for the former is flatly contradicted by the allegations of the plaintiffs' Complaint, which must be construed in the manner most favorable to sustaining their challenged claim, and the latter depends upon unpleaded facts as to the true nature and size of the group of potential investors in RCI, which cannot be considered at all on a motion to strike. Each such claim can only be adjudicated on a motion for summary judgment or at trial, where the allegations of the challenged pleading can be contested and contradicted. Accordingly, the defendants' Motion to Strike must also be denied with respect to the CT Page 458 Second Count.
 E. Challenges To Plaintiffs' Claim of Negligence For Alleged Failure To Properly Plead That The Defendants Intended To Induce The Plaintiffs To Rely Upon Their Alleged Misstatements in RCI's Financial Disclosures And Alleged Failure to Assert A Claim of Negligence That Is Distinct From Their Claim of Negligent Misrepresentation
The defendants next challenge the plaintiffs' claim of negligence, as pleaded in the Third Count of their Complaint, on two separate grounds. First, they claim that the Third Count, like the First and Second Counts, fails to allege sufficient facts to support their claim that the defendants "intended for them to rely upon the material misrepresentations and omissions made in the 1997 and 1998 10-Ks." Complaint, Count I, ¶ 98. This claim was argued on precisely the same basis as the defendants' parallel challenges to the First and Second Counts, and must be rejected for the same reasons that caused the Court to reject the latter challenges.
The defendants' second challenge to the Third Count is that the claim therein presented does not state a claim for which relief can be granted that is separate and distinct from their claim of negligent misrepresentation, as pleaded in the Second Count. This, they claim, is so because apart from their allegations of negligent misrepresentation, which are repeated and realleged in the Third Count, the plaintiffs have pleaded no other facts tending to establish that the defendants owed them a duty of reasonable care in relation to the preparation and filing of the 1997 and 1998 10-Ks.
The plaintiffs respond to this argument by invoking the general test for the existence of a legal duty, as recently articulated by the Connecticut Supreme Court in Gomes v. Commercial Union Insurance Co.,258 Conn. 603, 614, 783 A.2d 462, 470 (2001). The Gomes Court explained that
 Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The CT Page 459 ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that [sic] is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the same general nature as than suffered was likely to result?
Under Gomes and the cases upon which it relies,
 the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination of public policy analysis, of whether the defendant's responsiblity for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.
Id., 616.
In this case, the plaintiffs claim that they have pleaded sufficient facts to establish that the defendants owed them a legal duty of care because they have alleged facts from which it might reasonably be inferred that the defendants knew or should have known that harm of the same general nature as that which the plaintiffs claim to have suffered was likely to result from their conduct. They claim, in particular, that the defendants' duty arose from what they knew or should have known as to the following facts: that the Notes were being publicly traded; that potential purchasers of the Notes, like the plaintiffs, would look to the statements in the 10-Ks when determining whether or not to buy them; and that their statements in the 10-Ks were materially misleading with respect to the financial health of RCI.
In sum and in substance, this claim is no different from the plaintiffs' claim of negligent misrepresentation. The conduct on which it is based, like that which underlies the claim of negligent misrepresentation, is the negligent making of materially misleading statements in RCI's publicly filed financial documents. The way in which such conduct is claimed to have caused actionable harm to the plaintiffs, moreover misleading them to purchase the Notes based on false information as to the financial health of RCI — is also identical to that CT Page 460 alleged in the Second Count, charging negligent misrepresentation. Hence, there is simply no reason for treating the claim as something other than a claim for negligent misrepresentation, or allowing the claim to proceed without satisfying the requirements for negligent misrepresentation, as set forth in Restatement § 552.
The Court thus agrees with the defendants that this claim is merely duplicative of the claim presented in Count Two. Accordingly, the claim is ordered stricken with the understanding that its essential allegations are already pending before this Court in the Second Count of the Complaint.
 F. Challenge To Plaintiffs' Claim of Breach of The Affirmative Duty of Full And Honest Disclosure On The Ground That Connecticut Does Not Recognize That Tort In This Context
The defendants argue that the plaintiffs' claim of breach of the affirmative duty of full and honest disclosure, as pleaded in the Fourth Count, does not exist as a common-law tort in Connecticut. The plaintiffs contend that the breach of the affirmative duty of disclosure is a variation on a fraud claim and breach of this duty requires a failure to disclose known facts when there was a request, occasion or circumstance that imposes a duty to speak. The plaintiffs argue that one who voluntarily makes a disclosure or assumes to speak must make a full and fair disclosure as to those matters.
"The general rule is that . . . silence cannot give rise to an action . . . to set aside the transaction as fraudulent. . . . [M]ere nondisclosure . . . does not amount to fraud." Citations omitted; internal quotation marks omitted.) Duksa v. Middletown, 173 Conn. 124,127, 376 A.2d 1099 (1977). "To constitute fraud on that ground, there must be a failure to disclose known facts and, in addition thereto, a request or occasion or a circumstance which imposes a duty to speak."Id. See also Marchand v. Presutti, 7 Conn. App. 643, 645, 509 A.2d 1092
(1986) ("The crux of a fraudulent nondisclosure is a failure to disclose known facts and . . . or a request or an occasion or circumstance which imposes a duty to speak.").
It is clear that Connecticut recognizes a claim of a fraud based on nondisclosure in certain situations, but courts have not gone so far as to recognize a claim for a breach of an affirmative duty of disclosure. Therefore, the plaintiffs cannot assert an independent cause of action for breach of the affirmative duty of disclosure. Rather, the plaintiffs may claim that there was a fraudulent nondisclosure and include it in a CT Page 461 cause of action for fraud. Accordingly, the Court hereby grants the defendants' Motion to Strike Count Four on the ground that breach of an affirmative duty of disclosure is not a cognizable claim.
 G. Challenge To Plaintiffs' Claim of Breach of Fiduciary Duty On Grounds That Plaintiffs Have Have Failed to Allege Breach of Any Fiduciary Duty Owed By Corporate Officers and Directors To Corporate Creditors Under Delaware Law, And In Any Case Lack Standing To Assert Such A Claim
The defendants have moved to strike the plaintiffs' claim of breach of fiduciary duty, as pleaded in the Fifth Count of the Complaint, on two grounds. First, the defendants assert that the plaintiffs' claim of injury relating to the alleged difference in the value of their individual bondholdings from that which they allegedly expected when they purchased the Notes cannot support a breach-of-fiduciary-duty claim. On this score, they argue that under Delaware law, which all parties agree to be controlling, the only fiduciary duty that is owed by corporate officers and directors to the creditors of an insolvent or nearly insolvent Delaware corporation is to maximize the assets of the corporation for the common benefit of all creditors, for whom those assets, in times of insolvency or near insolvency, are held in constructive trust. Here, claim the defendants, the plaintiffs have failed to plead a breach of that singular duty because they have not alleged that the defendants, by making their alleged misstatements about the financial health of RCI in the 1997 and 1998 10-Ks, did anything to harm the company or to compromise its long-term wealth-creating capacity.
As a fallback argument, the defendants assert that even if the plaintiffs have somehow pleaded a valid claim of breach of fiduciary duty under the so-called "trust fund doctrine," they lack standing to bring that claim on their own behalf because the underlying duty to maximize corporate assets, upon whose breach the claim is based, is owed directly to corporation itself, and only indirectly to individual creditors as members of the broader community of interests that comprise the corporation. Therefore, they argue, such a claim is a classic derivative claim that can only be asserted either by or on behalf of the corporation, if it is not in bankruptcy, or by the bankruptcy trustee if bankruptcy proceedings have begun.
The plaintiffs have responded to these arguments as follows. First, they rightly argue that in Delaware, although the officers and directors of a corporation generally owe no duties to the creditors of their CT Page 462 corporation apart from those arising under the creditors' contracts with the corporation, they owe certain "extra duties" to corporate creditors when "there are special circumstances which affect the[ir] . . . rights as creditors of the corporation, e.g. fraud, insolvency, or a violation of a statute." Harff v. Krekorian, 324 A.2d 215, 222 (1974), rev'd inpart on other grounds, 347 A.2d 133 (1975). Here, claim the plaintiffs, the defendants owed them such "extra duties" at the time of their alleged misstatements in the 1997 and 1998 10-Ks because RCI was then insolvent or in the vicinity of insolvency; see Creédit Lyonnais BankNederland N.V. v. Patheé Communications Corp., Civ.A. No. 12150, 1991 WL 277613, at *36 (Del.Ch. Dec. 30, 1991); and by making such misstatements they committed fraud. The plaintiffs claim that the defendants defrauded them as creditors of RCI by intentionally misleading them to purchase the Notes based on material misstatements as to the financial health of RCI in RCI's 1997 and 1998 10-Ks. Such fraudulent conduct is claimed to have constituted a breach of the defendants' fiduciary duties to the plaintiffs, as creditors of RCI, because at a time when RCI was insolvent or in the vicinity of insolvency, it allegedly gave preferential treatment to officers, directors and shareholders of RCI at the expense of the plaintiffs and other creditors. While the defendants derived financial benefits from sales of the Notes — retaining their positions at RCI and receiving large incentive bonuses — the plaintiffs unwittingly footed the bill by purchasing the Notes without any reasonable prospect that they would ever be paid.
As for the defendants' challenge to the plaintiffs' standing to bring their breach-of-fiduciary-duty claim, they plaintiffs insist that they do indeed have standing because the harm they suffered and now complain of was assertedly special — that is, direct and personal as to them — not general to the corporation, or even to all of the corporation's creditors.
For the following reasons, the Court agrees with the defendants that the plaintiffs' Fifth Count must be stricken for failure to plead a valid claim of breach of fiduciary duty.
1. Alleged Breach of Fiduciary Duty Based On Fraud
Turning first to the plaintiffs' claim that a corporate officer or director of a Delaware corporation owes a fiduciary duty to any creditor of the corporation whom he or she defrauds, this Court must be guided by the courts of Delaware, which have long rejected that claim. InContinental Ill. Nat'l Bank and Trust Co. of Chicago v. Hunt Int'lResources Corp., Del. Ch., C.A. No. 7888, Jacobs, V.C. (Feb. 27, 1987), CT Page 463 1987 WL 55826, in particular, the Delaware Chancery Court was asked to decide if, under the "special circumstances rule" of Harff v. Krekorian,
supra, the "extra duties" imposed upon corporate officers and directors who defraud corporate creditors are fiduciary duties, for breach of which defrauded creditors can sue offending officers and directors both for fraud and for breach of fiduciary duty. Concluding that such "extra duties" are not fiduciary in nature, the Continental Court dismissed the plaintiff's breach-of-fiduciary-duty claim while permitting its parallel fraud claim to proceed.
Since its decision in Continental, the Chancery Court has consistently held that "a creditor c[an] not maintain a claim for breach of fiduciary duty, as distinguished from a claim for fraud, against a director based on allegations of fraud." Geyer v. Ingersoll Publications Co.,621 A.2d 784, 789 (Del.Ch. 1992). Accord, Simons v. Coogan, 524 A.2d 785
(Del.Ch. 1987). This Court will follow the lead of the Chancery Court by rejecting the plaintiffs' current argument that their claim of breach of fiduciary duty can be based upon the defendants' alleged fraudulent conduct.
 2. Alleged Breach of Fiduciary Duty Based On Conduct Adverse to the Plaintiffs' Interests As Creditors When RCI Was Insolvent or In The Vicinity of Insolvency
Turning to the plaintiffs' alternative basis for claiming that the defendants owed them a fiduciary duty at the time of their alleged misstatements in the 1997 and 1998 10-Ks — that they were creditors of RCI at a time when RCI was insolvent or in the vicinity of insolvency — the Court must initially agree with the plaintiffs that the defendants did indeed owe them a fiduciary duty at that time. That duty, however, as the defendants have correctly argued, was very focused and particular. Arising directly from the corporation's subsisting condition of insolvency or near insolvency, the duty required the defendants, as officers and directors of RCI, to maximize the assets of their financially distressed corporation in order to protect the common interests of all creditors of the corporation in being paid. By its nature, this duty was owed generally to all creditors, not specially or directly to any particular creditor.
Under normal circumstances, it is well accepted, in Delaware as elsewhere, that corporate officers and directors generally owe fiduciary duties only to the corporation and its shareholders. See, e.g., Geyer v.Ingersoll, supra, 621 A.2d at 788. Those duties, which include "a duty of care, which obliges directors to inform themselves of all material information prior to making a business decision, and a duty of loyalty, CT Page 464 which requires that directors not stand on both sides of a transaction such that there may be a conflict between a director's duty to the corporation and his self-interest, [are] . . . imposed by law upon directors because directors are in a position of trust with regard to the corporation and [its] equity holders." Christopher L. Barrett, "Healthco and the "Insolvency Exception": An Expansion of the Doctrine?," 16 Bank. Dev. J. 441, 44 (2000). By contrast, fiduciary duties are not typically owed by corporate officers and directors to corporate creditors because the debtor-creditor relationship is not based upon trust but upon arm's-length bargaining in the relevant marketplace. Generally, then, it is well understood that the rights of corporate creditors are limited to those set forth in their contract of indenture. Id.
When, however, a corporation becomes insolvent or nearly insolvent, the Delaware courts have recognized that the interests of creditors in the assets of the corporation become senior to those of the corporation's shareholders, for it is from those assets that the corporation's debt to its creditors must be paid. The law thus imposes a constructive trust upon those assets for the benefit of all creditors, and a fiduciary duty upon the corporation's officers and directors to preserve those assets for the benefit of creditors. Id.
Initially, the "trust fund doctrine" was deemed to be applicable only when the corporation became insolvent, either by formally filing for bankruptcy or by reaching the point where its liabilities exceeded its assets. Later, however, the doctrine was expanded to cases in which the corporation, though not yet technically insolvent, was yet so close to insolvency as to create probable conflicts among its various constituencies, including shareholders and creditors, as to how best to manage the corporation for the benefit of the corporate enterprise. Declaring that "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk [e.g. shareholders], but owes its duty to the corporate enterprise," the Chancery Court, in Creédit Lyonnais Bank Nederland, N.V. v.Patheé Communications Corp., supra, 1991 WL 277613, at *36, ruled that corporate officers and directors assume fiduciary duties to corporate creditors, as part of the "community of interest" that sustains the corporation, whenever they operate the corporation "in the vicinity of insolvency.
In this case, the plaintiffs have undeniably pleaded that at the time of the defendants' alleged misstatements in the 1997 and 1998 10-Ks, RCI was insolvent or in the vicinity of insolvency. By so pleading, they have clearly established a basis for claiming that the defendants, as officers and directors of RCI, owed them a fiduciary duty, as creditors of RCI, to CT Page 465 maximize the assets of RCI for their benefit and that of all of RCI's creditors.
The alleged breach of duty they have pleaded in the Fifth Count, however, does not involve the failure to maximize the assets of RCI, for the benefit of RCI's creditors or otherwise, or any other conduct by the defendants that allegedly compromised RCI's ability to pay its debts to creditors as they became due. Instead, the plaintiffs' claim involves allegedly misleading conduct which, though arguably fraudulent, actually increased RCI's pool of assets, albeit at the plaintiffs' expense. Because such conduct, though actionable as fraud, does not constitute a breach of the one and only fiduciary duty that the defendants, as officers and directors of an insolvent or nearly insolvent corporation, owed the plaintiffs' as creditors of that corporation, the plaintiffs' Fifth Count must be stricken for failure to plead a valid claim for breach of fiduciary duty.
H. Individual Challenges by Defendants Kaung, Becker and Corso
Defendants Kaung, Becker and Corso have also asserted independent grounds for the Court to strike certain claims only with respect to them.
Becker and Corso have moved to strike the First count of the complaint on the ground that the plaintiffs failed to allege sufficient facts to connect any of the allegedly fraudulent representations to them. The plaintiffs allege in the Complaint that Becker signed both the 1997 and 1998 10-Ks and that corso signed the 1996 10-K. Additionally, the plaintiffs allege that corso, as CFO of RCI from October 1997 to September 1998, was responsible for ensuring the accuracy of all of RCI's financial statement, and chat Becker was CEO from. May 1997 to September or October 1998 and served on RCI's Audit Committee during 1997 and 1998.
Becker and Corso argue that the plaintiffs failed to allege that they had any motive to commit fraud. Motive, however, is not an essential element of fraud. "The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury." (Citations omitted.) Suffield Development Association, L.P. v. NationalLoan Inv., supra, 64 Conn. App. 202. Although the plaintiffs are required to allege that the false statement was made with intent to induce the other party to rely upon it, it is not necessary to allege facts that demonstrate the defendant's motive for making such a statement. The plaintiffs are not required to allege that Becker and Corso had any CT Page 466 financial interest in RCI or that they would have profited from the alleged fraud. It is sufficient for the plaintiffs to allege that Becker and Corso were signatories on the 1997 and 1998 10-Ks and that they intended for purchasers of the Notes, such as the plaintiffs, to rely on these statements when making their decision to purchase the Notes. Accordingly, Becker and Corso's Motion to Strike must be denied with respect to the First Count.
In their Motion to Strike, Becker and Corso do not move to strike any of the other counts in the Complaint, although they do argue in their memorandum of law that the Court should strike the negligent misrepresentation claim in the Second Count because the Complaint fails to demonstrate how Becker and Corso had any duty of disclosure to the plaintiffs or that Becker or Corso knew that the plaintiffs purchased the Notes. Because Becker and Corso failed to specify the grounds of insufficiency of the Complaint with respect to the negligent misrepresentation claim against Becker and Corso in their Motion to Strike, the Court concludes that the Motion, at least with respect to Becker and Corso's independent grounds for striking the Second Count, is fatally defective.[7] Therefore, the Court need not address Becker and Corso s arguments to strike the Second Count of the Complaint.
Turning to Kaung's Motion to Strike, the Court finds that it need only address Kaung's independent grounds for striking the First and Second Counts because the Court has already stricken the Third, Fourth and Fifth Counts. Kaung moves to strike the First and Second Counts on the grounds that the plaintiffs have failed to properly allege fraudulent nondisclosure against him and failed to state a cognizable claim for negligent misrepresentation against Kaung.
With respect to the allegations of fraudulent misrepresentation in the First Count, Kaung argues that there can be no finding that he intended to induce the plaintiffs to purchase the Notes because the March Purchases occurred five months after he terminated his employment and relationship with RCI. Kaung argues that the plaintiffs have failed to allege that he then had a duty to speak. Additionally, Kaung argues that he no longer worked for RCI when the 1998 10-K was filed and therefore, as to the August Purchases, the plaintiffs have failed to allege any cognizable claim of fraud against Kaung.
Kaung's arguments with respect to the March Purchases are not convincing. The plaintiffs have alleged that Kaung signed the 1997 10-K and that he served as CFO of RCI from July 1995 to October 1997. As CFO, Kaung was responsible for ensuring the accuracy of RCI's financial statements. The plaintiffs have further alleged that the defendants, CT Page 467 including Kaung, knew that the information in the 1997 10-K was false and misleading and that the defendants, including Kaung, prepared and signed the 1997 10-K, which was designed to convince investors to purchase the Notes. (Complaint, §§ 60-75). Thus, the allegations with respect to the 1997 10-K are sufficient to support a cause of action for fraud against Kaung.
The conclusion by the Court that the allegations with respect to the 1997 10-K and the March Purchases sufficiently allege a cause of action for fraud against Kaung dispenses with the need for the Court to address Kaung's argument that the plaintiffs failed to sufficiently allege fraud against him with respect to the 1998 10-K and the August Purchases. Since the First Count is based on both the 1997 and the 1998 10-Ks and both the March and the August Purchases, the First Count is legally sufficient to state a claim against Kaung due to the sufficiency of the claims with respect to the 1997 10-K and March Purchases. If even one of several stated bases for relief in a challenged count is legally sufficient to state a valid claim, the motion to strike that count or claim must be denied. Covino v. Pfeffer, 160 Conn. 212, 214-15, 276 A.2d 895 (1970). Accordingly, defendant Kaung's Motion to Strike with respect to the First Count must be denied.
Kaung also argues that the Court should strike the Second Count with respect to him because the plaintiffs have failed to allege any direct contact between himself and the plaintiffs. According to Kaung, a cause of action for negligent misrepresentation requires the plaintiffs to allege that he provided false information directly for the plaintiffs' guidance and that he intended for the plaintiffs to rely on the 1997 10-K to influence their purchase of the Notes in March 1998. This argument is essentially the same as the main argument made by all the defendants that the Court should strike the Second Count. See Part IV-D, supra. The Court therefore denies Kaung's Motion to Strike with respect to the Second Count for essentially the same reasons as those discussed in that section of this Memorandum of Decision. It is "not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker intends to reach and influence either a particular person or persons. . . ." Restatement (Second), Torts, § 552, comment (h) (1976). The plaintiffs have alleged that the defendants, including Kaung, intended to supply the 1997 10-K to a certain group of persons — potential purchasers of the Notes — and that the plaintiffs belonged to this group. Furthermore, the plaintiffs have alleged that they justifiably relied upon these financial statements and thereby suffered pecuniary losses. Although Kaung's arguments that he had left RCI long before the 1998 10-K was prepared and filed and before the plaintiffs purchased CT Page 468 additional notes in August 1998 may have some merit, the Court denies his Motion to Strike with respect to the Second Count based on the sufficiency of the plaintiffs' allegations against him with respect to the 1997 10-K and the March Purchases. As stated previously, if even one of the several bases for relief in a challenged count is sufficient to state a strike, denied. For the foregoing reasons, the Court hereby denies Motion to Strike with respect to the Second Count.
CONCLUSION
Based on the foregoing analysis, the Court hereby concludes that the defendants' pending Motions to Strike must be DENIED with respect to the First and Second Counts of the plaintiffs' Complaint, but must be GRANTED with respect to the Third, Fourth. and Fifth Counts of the Complaint for failure to state claims upon which relief can be granted.
IT IS SO ORDERED THIS 2nd day of January, 2003.
 ___________________, J. Michael R. Sheldon